**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**AT CINCINNATI**

**CANDY MARCUM, individually**
**and as Administratrix of the**
**Estate of William Marcum,**

**Plaintiff**

**v.**                                        **Case No. 1:10-cv-790-HJW**

**SCIOTO COUNTY, OHIO, et al,**

**Defendants**

**ORDER**

Four motions are pending: the "Motion for Summary Judgment" (doc. no. 77) by Scioto County and Sheriff Marty Donini ("the County defendants"); the "Motion for Summary Judgment" (doc. no. 78) by Officers Jason Lute, Craig Johnson, Jay Springs, Brett Ervin, Zach Conkel, and Kristi Powell ("the Individual Officers"); the "Motion for Summary Judgment" (doc. no. 82) by Dr. David Walker; and the jointly-filed "Motion to Strike Evidence" (doc. no. 111) by the County defendants and the Individual Officers. Plaintiff has filed briefs in opposition (doc. nos. 107, 119, 124), and the defendants have replied separately (doc. nos. 110, 112-115, 120). The defendants have filed separate "Proposed Findings of Fact and Conclusions of Law," which the plaintiff has high-lighted as true, false, or irrelevant (doc. no. 93, Exs. 1-3).

Upon referral, the Magistrate Judge issued a "Report and Recommendation"

1

("R&R") (doc. no. 125). She denied the motion to strike evidence. She then considered that evidence and recommended denying the respective motions for summary judgment by Dr. Walker and the Individual Officers. She also recommended that the motion for summary judgment by the County defendants be granted in part and denied in part. The defendants filed objections (doc. nos. 132, 133), and plaintiff responded (doc. nos. 134, 136). This Court held a hearing on June 3, 2014, at which counsel presented oral arguments. Upon *de novo* review of the record, including the parties' briefs, exhibits,[1] proposed findings, objections, and applicable authority, the Court will <u>sustain in part and overrule in part</u> the objections and <u>modify</u> the Report and Recommendation, as set forth herein, for the following reasons:

I. Background and Procedural History

Although the parties dispute various "characterizations" of the evidence, the Court will rely on the actual evidence itself, rather than any descriptions of it. The Court also observes that various facts "disputed" by the parties are not material to the merits or that the evidence does not actually reflect any "genuine" dispute as to certain facts. The Court further notes that some of the claimed "disputes" are merely disagreements as to the legal implications of the facts, not

---

[1] In addition to voluminous briefing, the parties have filed numerous exhibits, including affidavits, jail records, and transcripts of the depositions of the defendants, the deputy coroner (Dr. Karen Looman, M.D.), various opinion witnesses (Drs. Exline, Parker, Wilcox, King, and Mendel), various jail employees (Nurse Estes, administrator Capt. Shawn Sparks, and Deputy Matthew Frantz), several inmates (Justin White, David Merrill), and Candy Marcum.

disputes of the facts themselves. Such instances will be noted herein.

William Marcum ("Marcum"), an admitted abuser of illegal "street drugs" and prescription drugs (including amphetamines, cocaine, marijuana, LSD, Xanax, and Valium),[2] stole credit cards from his pregnant wife's employer and then made purchases at various stores with those stolen credit cards. Marcum, who had previously been incarcerated, including in 2003-2004 for illegal drug and firearm possession, was arrested and subsequently pleaded guilty to theft and identity fraud charges. He was admitted to the Scioto County Jail on October 10, 2008, to begin serving his two-year sentence (doc. no. 103-1 at 2).

The Scioto County Jail is a new 190-bed facility that opened in 2006 (Donini Dep. at 8). It is a relatively small jail with an average daily population of 165 inmates with an average length of stay of 11 days (doc. no. 77-3, Donini Aff. ¶ 3). During 2007-2009, over 15,000 inmates were processed, with over 5,000 processed in 2008 (Id. ¶ 11). Consistent with Ohio administrative requirements, the jail had written policies in place regarding its medical program (Id. ¶ 8, Ex. 1). The jail is equipped with emergency medical equipment, including automated external defibrillators ("AEDs") and oxygen for emergency use (Donini Dep. at 60; Sparks Dep. at 60). Since 2006, each jail employee was first aid trained within 12 months of employment (doc. no. 124-5 at 7). Various correctional officers were also trained as emergency medical technicians ("EMTs"). Sheriff Donini indicates that

---

[2] See "Initial Medical/Mental Health/Substance Abuse Screening" Form (doc. no. 77-2 at 28, 31 indicating "history of alcohol and drug problem" including intra-nasal abuse of multiple drugs).

"[e]mployees assigned to the jail went through a standard ... 136-hour state required correctional certification ... [and] received training on policies and procedures ... includ[ing] requests for medical attention, the dispensing or making sure that they got their medication as prescribed by the physician, making decisions on what an emergency was" (Donini Dep. at 52-53).

Scioto County contracted with Dr. David Walker, M.D., who is board-certified in family medicine, to provide medical services to inmates (Walker Dep. at 8; Donini Dep. at 43-44). Dr. Walker served as Medical Director and provided medical care to inmates during 2000-2009. The Scioto County Jail had written policies for its medical program (prepared by jail administrator Capt. David Hall), which Dr. Walker reviewed and found acceptable (Walker Dep. at 13; Donini Dep. at 49, Ex. 1). A registered nurse (Jeremy Estes) also worked at the jail, and a second nurse (Jessica Eldridge, LPN) was hired in late November 2008 (Id. at 42; Sparks Dep. at 23; Estes Dep. at 14). Estes was certified to teach the annual training provided through the Ohio Attorney General's Ohio Peace Officer Training Academy ("OPOTA") and gave instruction to the corrections officers on subjects such as infectious diseases, blood borne pathogens, and communicable diseases (Id. at 26-27). He indicates that the jail administrator asked him to provide this training (Id. at 28).[3]

_____

[3] Estes explained that in addition to the OPOTA training, "I engaged numerous times on a regular basis with the officers that I worked with anytime I felt like there was a need and new issues arising. Anything that I felt like they needed to know, I would give that information to them on an informal basis." (Id. at 28-29). He

4

As the attending physician, Dr. Walker would come to the jail infirmary several times each week to see patients, depending on the number of inmates who had requested medical care and/or were on the sick call list. Medical staff would pull those inmate's charts for the physician to review. The nurse would order any medications prescribed by the physician (Walker Dep. at 38 "I would say it was okay and they would get it refilled;" Estes Dep. at 15-16 "I kept order sheets of everything I faxed over to Wooster's Pharmacy."). Corrections officers were responsible for dispensing the medications that the physician had prescribed to inmates. For security reasons, medications were kept locked in the medical area (see, e.g., Merrill Dep. at 36-37, explaining that the jail had to be careful "because people try to rob the cart ... [t]ry to get into and steal medication"). Officers would initial the medication log when they dispensed a prescribed tablet to an inmate.

Pursuant to jail policy, new inmates would have a physical examination by the physician and/or nurse before the fifteenth day of incarceration (Estes Dep. at 18, Ex. 1, Scioto County Jail policy, § 4.03). The nurse kept a log of all inmates and would offer them their physicals. Inmates have the right to refuse medication or other treatment, including physical examination (Donini Aff., Ex. 3; Sparks Dep. at 47; King Dep. at 69). Inmates would have to sign a written release if they refused

---

indicates this included advice about responding to inmates with asthma (Id. at 30-33). He points out that corrections officers are not doctors and are "trained to take the complaint and to get help." (Id. at 34; see also Donini Dep. at 72 indicating that if a corrections officer observes an inmate having breathing difficulties, the officer needs to summon "immediate medical help ... [a]nd if need be, to try to actually help that inmate breathe ... [by using] the Ambu bag").

the examination. If inmates refused medication, an "R" was initialed on the medication log (Donini Dep. at 63; Frantz Dep. at 61-62).

Upon being booked into jail in 2008, Marcum completed a medical health screening questionnaire. The questionnaire included a section where the booking officer recorded personal observations of the inmate, as well as a section for the inmate to complete (doc. no. 66-1 at 1-2). Marcum checked "yes" for asthma, but indicated that he was not taking any medication and had no medication with him. His wife later testified that in past years, he had occasionally used an over-the-counter Primatene Mist inhaler when the seasons changed and had used an Albuterol inhaler for "a week or two" in February of 2003 (Candy Marcum Dep. at 32, 35-36). Medical records indicate that Marcum had gone to the emergency room once in the past ten years for breathing difficulties, but that he took no medication for asthma while incarcerated in 2003-2004 (doc. no. 77-2 at 2-5, 9, 17, 29, 30). Marcum was a heavy smoker, despite a medical recommendation in 2003 that he consider "smoking cessation" (doc. no. 77-2 at 21, medical progress notes indicating Marcum was a "heavy cigarette smoker").[4]

On October 16, 2008, Marcum submitted a Medical Care Request, indicating: "I need to get my Albuterol tablets (2x daily) and inhaler for my asthma[.] I've been here since the 10th without any and I'm starting to have attacks." The request was

---

[4] See Candy Marcum Dep. at 36-37, Q: How often did he smoke? A: Every day. Q: And how much did he smoke? A: Pack a day. . . at 70-71, Q: Was he still smoking when he went into the jail? A: Yes. Q: Still a pack a day? A: Yes.

approved (Estes Dep. at 110, Q: And the prescriptions for Mr. Marcum were authorized by Dr. Walker, right? A: Yes.). Based on Marcum's own statement indicating his prior use of Albuterol (2x daily), the medication was ordered as a "home medication refill" (Parker Dep. at 39, explaining that since Marcum "knew the medications he was taking and the dose and the nurse put it down as a renewal, then, as a physician, I would interpret that to be a refill").[5] Marcum was provided a week's supply of Albuterol tablets and an Albuterol inhaler. The prescription was for 14 tablets, with one tablet to be taken twice daily.

Inmates must go the medical area to get their daily medication, which was kept locked in a secure area. The jail allowed inmates with asthma to self-carry a fast-acting "rescue" Albuterol inhaler (Estes Dep. at 30, 37, 76, Q: ... the inhaler would have been given to Mr. Marcum to carry on his person? A: Yes; Ervin Dep. at 36-37, indicating that Marcum was designated as "self-carry" for his inhaler; Springs Dep. at 30, Q: And are there situations where some inmates are permitted to keep medication on them? A: Yes. For instance, ... inhalers; Donini Dep. at 83 same). This was "to make sure that [inmates] have access to their inhaler rather quickly" (Estes Dep. at 30).[6] The Albuterol inhalers, regardless of the brand name

---

[5] Although plaintiff "disputes" the fact that this was "described as a home refill" (doc. no. 93-1, Proposed Findings, ¶ 7), the prescription form so indicates.

[6] Although inmate Merrill indicated that inmates had to go to the medical area to use an inhaler, Nurse Estes explained that this was true for the daily longer-acting steroidal inhalers (which are prone to abuse), rather than the quicker-acting "rescue" inhalers, which the jail did allow to be self-carried by inmates with asthma (Estes Dep. at 30, "we would give them their inhalers to self-carry ... the

or color of the packaging, were all "therapeutically equivalent" (<u>Id</u>. at 103; doc. no. 77-4 at 6, ¶ 8, Report by Dr. Matthew Exline, M.D.). The jail also kept an Albuterol inhaler on the medical cart (doc. no. 31-2 at 26; Sparks Dep. at 42; Springs Dep. at 30-31).

Ten days later, on October 30, 2008,[7] Marcum submitted a Medical Care Request stating "I need my Albuterol tabs refilled" (doc. no. 31-2 at 12).[8] On this form, he did not indicate he wanted or needed another inhaler. The medical staff submitted the refill order, and on November 7, 2008, provided Marcum with

---

Albuterol ... rescue inhaler, I should say, not the inhalers that have steroids in them"). Although plaintiff red-lines the fact that Marcum was prescribed a self-carry inhaler (doc. no. 93-1, Proposed Findings, ¶ 23), the record reflects that Marcum had several Albuterol inhalers in his possession on November 16, 2008 (doc. no. 77-5 at 2-5). Marcum could also go to the medical cart to use an inhaler.

[7] Marcum apparently mis-dated this request "11-30-08."

[8] Although plaintiff red-lines as "disputed" the fact that Marcum "had not been taking the Albuterol tablets as often as had been prescribed" (doc. no. 93-1, Proposed Findings, ¶ 12), the records so indicate (doc. no. 31-2 at 26, medication log). Marcum asked for more tablets after ten days, even though his initial prescription would have lasted only seven days at the recommended dosage. The records reflect that Marcum took his tablets only twice between November 1 and 9 (Parker Dep. at 50, he "took it at 7:00 a.m. on the 1st. Then it looks like he took it at 9:00 p.m. on the 8th"). When asked about the dates that Marcum took his evening tablet but refused (or did not show up for) his morning tablet (November 10, 13, 14), Dr. Parker explained that asthma is commonly worse at night (<u>Id</u>. at 51, Q: Doctor, is it true that asthma symptoms become more significant at nighttime? A: Right. And that's why he would take it at night, and then he would feel fine in the morning and wouldn't need the Albuterol tablet during the day. So, I would interpret that he was having more trouble with asthma at night, which is a common finding with asthma ... So he takes a pill at bedtime so that he can sleep, but during the daytime he was breathing fine"). Dr. Exline agreed that "many asthmatics will have worsening symptoms at night, that's correct" (Exline Dep. at 43).

another week's supply of Albuterol tablets and an inhaler.[9]  On November 10, 2008, Marcum was offered, but declined, a physical examination by the physician and/or nurse (doc. no. 66-1 at 3, signed release for "HEALTH SCREEN," witnessed by Deputy Frantz).[10]  Marcum's reason for declining is not known, although he had a previous physical that year.[11]

On November 12, 2008, medical staff ordered a refill of Marcum's inhaler, and on November 15, 2008, ordered a refill for another week of Albuterol tablets for him. Justin White, an inmate with EMT training, indicates that he observed Marcum use his inhaler occasionally and obtain relief for any symptoms (White Dep. at 19, Q: I want to focus on this two or three days before. Did you witness him use his inhaler? A: Yes. Q: And did the inhaler at that time seem to provide him relief? A: Yes.). Marcum submitted no other written requests for health care (King Dep. at 82, Q: Was there any written request that Mr. Marcum made for medication, that was

---

[9] As Dr. Parker explained, the pharmacy made this mistake, with the result that Marcum was provided more (i.e. a second inhaler) than he actually requested (Parker Dep. at 51-52, 67-68).

[10] The printed form indicates in plain language that "I, William Marcum, do hereby refuse medical treatment from the Scioto County Sheriff's Office, and the County Jail Doctor, Nurse or Dentist, I understand that by refusing treatment concerning HEALTH SCREEN, I release the Scioto County Sheriff's Office and its employees, including the County Jail Doctor and Nurse of any responsibility and liability which may occur due to my refusing medical treatment" (doc. no. 66-1 at 3).

[11] The evidence reflects that Marcum worked for a scrap yard ("Livingston") in 2008 and was required to take a physical for that job (Candy Marcum Dep. at 42-43, Q: What did he do for them? A: Like ran a cutting torch ... He had to ... wear a breathing apparatus and had to have a physical or whatever to be able to do that. Q: So he had a physical before he started with Livingston? A: Before he started or while there, yes. Q: Okay. And they deemed him fit to work, I take it? A: Yes.).

denied to him? A: I don't think there's any evidence in the record that there was any denial of a request for medication, no.).[12]

Marcum's wife "Candy" indicates that on November 16, 2008 at "around noon," she spoke with her husband on the telephone. She indicates that she heard him wheezing and that he indicated he was having a "hard time breathing." Marcum's bunkmate later testified that he had also observed Marcum at this time (White Dep. at 46-47, Q: ... What were his symptoms at lunchtime? A: Short breaths. He was -- kept trying to catch his breath. If he sat there and relaxed for a little bit and controlled his breathing, it would ease up. He would be okay. Q: So at that time he was managing the situation himself, right? A: At that time, yes.).

Later that day, the 2nd shift officers came on duty at 4:00 p.m. Officers Lute, Johnson, and Springs were on duty in the jail dorm consecutively during the 2nd

---

[12] Although plaintiff "disputes" the proposed finding that "Marcum was educated on how to request medicines or medical care, which would have been known to him anyhow due to his prior incarcerations" (doc. no. 93-2, Proposed Findings, part B), the record reflects no genuine dispute on this point. When Marcum was admitted to prison in 2003, he was expressly advised that "routine medical concerns are taken care of on nursing sick call," and that in the event of "life threatening situations (chest pain, difficulty breathing, hemorrhage etc.)***Notify the nearest correctional officer of the problems you are having. They will alert the medical clinic and you will be seen at once" (doc. no. 77-2 at 10, printed form signed by Marcum). When he was incarcerated again in 2008, he acknowledged that he had "read and understood the rules of this jail as provided in the Inmate Handbook" which explained how to request medical services (doc. no. 103-1 at 2). It is undisputed that Marcum filled out and submitted several written health care requests at the Scioto County Jail. His bunkmate testified that Marcum knew how to request care (White Dep. at 48 "if it's urgent, you're supposed to request it through a CO. But if it's something they need to look at or have looked at, like a sprained ankle or something like that, then they give you a medical form that you fill out ... and they'll give it to the nurse or doctor").

shift (from 4:00 p.m. until midnight). They performed security checks by walking through the 60-inmate dorm area at various times during that shift. They all indicate that they observed nothing amiss during these security checks and that Marcum "never complained" to them about any problems, medical or otherwise, on November 16, 2008 or at any other time (doc. nos. 78-1, 78-2, and 78-3 Affidavits). Inmate White indicates that Marcum's asthma "kind of flared back up again" around 5:30 p.m., but that when Officer Johnson made his afternoon rounds and inquired generally how Marcum was doing, Marcum did not ask for any assistance (White Dep. 65, Q: Did he ask CO Johnson at that time, 5:00 or 5:30, for assistance? A: No.). White testified that he did not recall Officers Lute or Springs having any interaction with Marcum (White Dep. at 47, Q: Is that conversation with CO Johnson the only conversation between Marcum and a corrections officer regarding his asthma or breathing that you were present for? A: That day? Q: Yes. A: That I had witnessed, yes.).

Officer Johnson indicates that while he was at the front desk, Marcum walked up and asked for an inhaler. Officer Johnson looked for an inhaler on the medical cart and offered Marcum one, but according to Johnson, Marcum did not want that inhaler and walked away.[13] Officer Johnson indicates that Marcum did

---

[13] Although the medical testimony indicates that the three brands of Albuterol inhaler were all therapeutically equivalent, the evidence suggests that Marcum may have had a preference for certain brands which he identified by color (see Exline Dep. at 32 explaining that Albuterol inhalers "come in several brands or colors. And although they are all the same drug, the patient will think one works better than the other.").

not complain of any breathing difficulty at that time. Inmate White indicates that he noticed Marcum's breathing worsen noticeably around 9:00 p.m. (White Dep. at 65-66 "it did not become severe until later that evening, about 9:00"). Inmate Tommy Adams also indicates, albeit in an unsworn statement, that he observed that Marcum's breathing was getting worse and worse that evening and that Marcum was "pale and white." The videotape from the 2nd shift is not available, due to a machine malfunction that occurred one month later. The machine was sent out for repair, but the video recording could not be retrieved by the technology firm hired to do so (doc. no. 111, Exs. 4-6, maintenance records indicating hard disk drive failure).

At midnight, Officers Ervin, Powell, and Conkel came on duty for the 3rd shift (from midnight until 8:00 a.m.). None of the 2nd shift officers advised that Marcum was having any medical problems. Officer Ervin performed several initial security checks and indicates he observed nothing unusual (Ervin Dep. at 41). During the second check, he indicates that he saw Marcum sitting on his bunk, but did not hear him wheezing (Id.). He indicates that Marcum did not flag him down or seek assistance at that time.

Shortly after midnight (i.e. early a.m. on November 17, 2008), Marcum approached the guard desk. At 12:23 a.m., Marcum indicated to Officer Ervin that he was having trouble breathing and requested an inhaler because his was empty, i.e. "not working" (doc. no. 78-4, Ervin Aff. ¶ 7). Officer Ervin verified that Dr. Walker had authorized such medication for Marcum and at 12:24 a.m. gave him an

Albuterol inhaler to use. He indicates that Marcum used the inhaler and that it initially seemed to help, but that Marcum then had to sit down at one of the nearby tables (Id. at ¶ 10; Ervin Dep. at 37, 48). Officer Ervin called shift supervisor Deputy Kristi Powell to report that Marcum was having trouble breathing and that she needed to call the emergency squad (Ervin Dep. at 38, 49). Dep. Powell, who was EMT-trained, called for an ambulance and quickly responded to the dorm area. Dep. Powell, assisted by two inmates (White and Followay), helped Marcum toward the booking area to await the ambulance (Id. at 38). These events were recorded on surveillance video that has been furnished for the record.

Before the ambulance arrived, Marcum's condition deteriorated and he collapsed at approximately 12:30 a.m. Dep. Powell administered "bag-masked ventilation" in an effort to help Marcum's breathing to no avail. When Marcum subsequently stopped breathing and went into cardiac arrest, she applied an AED defibrillator at approximately 12:36 a.m. CPR was administered until the ambulance arrived minutes later at 12:39 a.m. Emergency medical personnel initiated advanced life support and intubated Marcum for transport to the hospital, but he did not survive. He was pronounced dead at 1:00 a.m.

Sheriff Donini requested the Ohio Attorney General's Bureau of Criminal Investigation and Identification ("BCI") to conduct an independent investigation (Donini Dep. at 35 "It's pretty well standard procedure ... [to] begin processing and securing the scene where the events occurred. Contact BCI&I. Ask them to assist us in conducting an independent, unbiased investigation."). BCI Agent Mark

Rohrer reviewed the documentary evidence, viewed the videotape of the 3rd shift (i.e. the emergency care provided to Marcum), interviewed various officers and inmates, and sought to interview plaintiff's family (who refused to be interviewed). He ultimately recommended that no criminal action was warranted.

Meanwhile, Deputy Coroner, Dr. Karen Looman, M.D., performed an autopsy for the Hamilton County Ohio Coroner's office. It is undisputed that Dr. Looman, who is board-certified in forensic and anatomic pathology, determined the cause of death was "status asthmaticus" from an "acute allergic reaction" (doc. no. 93-1, Proposed Findings, ¶ 39). At deposition, Dr. Looman explained that she found evidence of acute allergic reaction, but could not determine specifically what caused it.[14]

The autopsy's toxicology screen was positive for benzodiazepine, and further testing confirmed a trace amount of a specific benzodiazepine (i.e. the nordiazepine metabolite for Valium) in Marcum's body (Looman Dep. at 44, 47, 74; see also, Parker Dep. at 71 "when they looked for specific benzodiazepene, the nordiazepine metabolite of Valium was the one that showed up").[15] Dr. Looman

---

[14] Looman Dep. at 31 ("And so I'm describing that I'm seeing the mucus plugs in each of these air spaces, the bronchioles and all this mucus still has -- has eosinophils in it. Q: And what does that tell you? A: That there's an acute allergic reaction going on."). . . and at 36 ("Q: . . . you testified that the eosinophils are an allergic response to something? A: Yes. Part of an allergic response, yes. Q: And based on your review, you can't tell what those eosinophils were responding to, can you? A. That's correct.").

[15] Although the Magistrate Judge indicated she was "unable to locate the term 'benzodiazepine' in Dr. Parker's deposition transcript" (doc. no. 125 at 25, fn. 10),

testified that this metabolite of Valium could be "left over from him ingesting [it] ... about 24 hours prior to his death" (Looman Dep. at 54). Although Dr. Looman initially used the word "ingested," she later clarified that Marcum's acute allergic reaction could be from drug inhalation (<u>Id</u>. at 55, 65). It is undisputed that Marcum had not been prescribed any Valium and had admittedly abused Valium in the past (doc. no. 77-2 at 28-30, indicating past "daily" abuse of sedatives, including Valium and Xanax). Marcum had admittedly abused drugs intra-nasally (doc. no. 77-2 at 24, noting a self-reported "history of intra-nasal drug use"). Valium is a controlled substance that can only be dispensed with a prescription. Dr. Looman testified that it is common practice for drug abusers to inhale Valium to "get a better high" rather than "simply taking it orally" (Looman Dep. at 74-75). Dr. Thomas Parker, M.D., further explained that inhaling drugs, such as Valium, into the lungs (by snorting or by smoking it) allows a drug abuser to get a quicker high with a smaller amount of the drug because the processes of the liver are bypassed (Parker Dep. at 68, 74 indicating that Marcum "would not have had to inhale very large amounts of the Valium for it to damage his lungs").[16] When asked if the inhalation of illicit

---

Dr. Parker not only expressly referred to such term, he explained at length the medical significance of the autopsy finding of this Valium metabolite in Marcum's body and the adverse effects of abusing drugs, such as Valium, by inhalation (Parker Dep. at 66-77).

[16] In his motion for summary judgment, defendant Dr. Walker points to the undisputed fact that Marcum died of status asthmaticus from an acute allergic reaction. Dr. Walker asserts that, based on the evidence including the testimony of medical witness Dr. Parker, such allergic reaction was likely triggered by inhaling benzodiazepines. Although the Magistrate Judge suggests that Dr. Parker's

drugs could aggravate asthma symptoms, plaintiff's witness Dr. Lambert King, M.D., agreed that "any exogenous substance that is not normal to intake by the body, that is inhaled, could certainly aggravate asthma" (King Dep. at 44). Dr. Looman agreed (Looman Dep. at 77 Q: And if you took a drug that depressed that function, it could hasten the development of respiratory distress, correct? A. Yes, it would certainly make it worse.). It is undisputed that Valium is a central nervous system depressant (Id. at 76, Q: And as a central nervous system depressant, one of the effects of a benzodiazepine is to depress respiratory function; is that correct? A: Yes.). Dr. King acknowledged that "benzodiazepines can be associated with respiratory arrest" (King Dep. at 88). The autopsy found no Valium

---

testimony "does not reflect this conclusion" (doc. no. 125 at 25, fn. 10), the deposition transcript does reflect this conclusion. Dr. Parker specifically explained that "by putting everything together, knowing that [Marcum] used drugs intra-nasally in the past and that we found evidence of Valium in his system at the time of the autopsy, I'm making the conclusion that the drug he inhaled was Valium (Parker Dep. at 77). Dr. Parker further stated, after detailed testimony on the subject, that Marcum "had an allergic reaction to the inhaled drug" (Id.). Given that the toxicology screen did not test for Xanax, which is another sedative that Marcum had admittedly abused, Dr. Parker left open the possibility that the allergic reaction may have been caused by inhalation of another illicit drug (Id. "There's lots of other drugs that he could have inhaled that would cause an allergic reaction in his lungs that may or may not have shown up on the toxicology screen"). Dr. Looman agreed (Looman Dep. at 54 "Any one of drugs that we don't test for could cause status asthmaticus."). Regardless, any "dispute" as to the specific drug (and method of abuse) that may have triggered the acute allergic reaction is not a genuine dispute of material fact with respect to the "deliberate indifference" claim. Only disputes over facts that might affect the outcome of the case under the governing law will properly preclude the entry of summary judgment. Anderson, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted."). In response to the objections, plaintiff acknowledges this (doc. no. 134 at 8 "this case does not concern what triggered Mr. Marcum's asthma attack, it concerns how the defendants, including Dr. Walker, responded").

pills in Marcum's stomach, and Dr. Matthew Exline, M.D., testified that the medical evidence did not indicate that Marcum had ingested the Valium.[17]

The autopsy report identified several other conditions that contributed to Marcum's lung disease, i.e. interstitial anthracosis and "mild to moderate emphysema" (Looman Dep. at 21-22, 33). Dr. Looman explained that interstitial anthracosis is a finding of smoking and that the emphysema was also "likely due ... to smoking."[18] Marcum's death certificate listed the cause of death as "status asthmaticus" from "bronchial asthma exacerbation" (doc. no. 77-6).

On November 10, 2010, Marcum's wife, Candy Marcum, filed a four-count federal complaint, alleging: 1) violation of 42 U.S.C. § 1983; 2) wrongful death

---

[17] Again, although the Magistrate Judge indicates that the parties "dispute" whether Marcum had "taken or inhaled benzodiazepine drugs within the 24 hours preceding his death" (doc. no. 125 at 17, ¶ 25), any such "dispute" is beside the point. Only genuine disputes of material fact will preclude summary judgment. Anderson, 477 U.S. at 248 (the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"). Regardless of whether Marcum had inhaled or ingested Valium (or some other substance), the autopsy and medical testimony all agree that Marcum had an acute allergic reaction and cardiac arrest that resulted in his death. Plaintiff's contention that the "cause of death is a fact issue that must be left to the jury" (doc. no. 107 at 39) is incorrect. The cause of death is undisputed. Only the trigger was not officially determined by the autopsy. In her response to the objections (doc. no. 134 at 8), plaintiff acknowledges that "the asthma trigger is not dispositive for summary judgment").

[18] Marcum had a history of smoking at least a pack of cigarettes daily, as well as smoking marijuana daily (doc. no. 77-2 at 28). Although inmates are not allowed to smoke in the jail (Donini Dep. at 21), Officer Johnson indicates he had previously caught Marcum smoking in the bathroom (doc. no. 31-4 at 8, BCI Interview). In fact, Officer Johnson indicates he caught a group of inmates smoking there during 2nd shift on November 16, 2008, but did not remember if Marcum was one of them.

under Ohio law; 3) loss of consortium under Ohio law; and 4) negligence under Ohio law. After discovery concluded, the defendants filed three separate motions for summary judgment, as well as a motion to strike (or disregard) certain inadmissible evidence. The individual defendants assert the affirmative defense of qualified immunity. All the defendants move for summary judgment on the § 1983 claim. The County defendants also move for summary judgment on the state law wrongful death claim. The motions, the Magistrate Judge's R&R, and the objections thereto, have been exhaustively briefed and are ripe for consideration.

## II. Review of Objections

The Magistrate Judge Act, 28 U.S.C. § 631, provides for *de novo* review by the district court when a party timely files specific written objections to an R&R on a dispositive motion. The District Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." 28 U.S.C. § 636(b)(1)(C)). Objections must be specific. Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995); Howard v. Sec. of HHS, 932 F.2d 505, 508-09 (6th Cir. 1991). Simply restating prior arguments does not amount to a "specific objection." See, e.g., Holl v. Potter, 2011 WL 4337038 (S.D.Ohio), affirmed by 506 Fed.Appx. 428 (2012). The Court is only required to conduct a *de novo* review of the portions of the R&R to which the parties have made specific objections. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). With respect to nondispositive pretrial motions, 28 U.S.C. § 636(b)(1)(A) provides that a "judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's

order is clearly erroneous or contrary to law."

III. Objections to Denial of the "Motion to Strike Evidence"

Before considering the summary judgment motions, the Court must first determine what evidence may properly be considered. The Court will first address the defendants' objections (doc. no. 133 at 7-9, 12-25) regarding the Magistrate Judge's denial (doc. no. 125 at 2-16) of their motion to strike (doc. no. 111). Defendants argue that the following evidence is inadmissible hearsay that should be stricken from the record and/or disregarded on summary judgment review: 1) certain deposition testimony of Candy Marcum about a telephone conversation she allegedly had with her incarcerated husband "around noon" on November 16, 2008; and 2) certain unsworn statements made by former Scioto County inmate Tommy Adams to state criminal investigator Mark Rohrer during the investigation of Marcum's death.

Striking material from the record is a drastic remedy that is disfavored and only sparingly used by courts. Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 822 (6th Cir. 1953). The Magistrate Judge correctly pointed out that courts will generally disregard inadmissible evidence rather than strike it from the record (doc. no. 125 at 2). The Court agrees that "striking" the challenged evidence is not warranted. See, e.g., Fox v. Mich. State Police Dept., 173 Fed.Appx. 372, 375 (6th Cir. 2006) (explaining that Rule 12 does not require courts "to remove documents other than pleadings from the record in a case" and that the documents may appropriately be dealt with on grounds of admissibility); Lombard

v. MCI Telecomm. Corp., 13 F.Supp.2d 621, 625 (N.D.Ohio 1998) ("a court should disregard inadmissible evidence, not strike that evidence from the record"). To the extent the defendants have moved to "strike" the evidence from the record, the Magistrate Judge's denial of such pre-trial motion was not "clearly erroneous" or contrary to law. See 28 U.S.C. § 636(b)(1)(A).

The more pertinent issue is whether the challenged evidence amounts to inadmissible hearsay that the Court must disregard on summary judgment review. The defendants correctly assert that the plaintiff may not rely on inadmissible hearsay. See Sperle v. Mich. Dept. of Corrections, 297 F.3d 483, 495 (6th Cir. 2002) ("a party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."); Alpert v. United States, 481 F.3d 404, 409 (6th Cir. 2007) ("evidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay ... must be disregarded."). Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing" which a party offers in evidence "to prove the truth of the matter asserted in the statement." Fed.R.Evid. 801(c). Plaintiff bears the burden of proving that any hearsay fits within an exception. United States v. Arnold, 486 F.3d 177, 206 (6th Cir. 2007), cert. denied, 552 U.S. 1103 (2008).

### A. the Candy Marcum Statement

In opposing summary judgment, plaintiff Candy Marcum seeks to rely on her own deposition testimony regarding an alleged telephone conversation with

her incarcerated husband "around noon" on November 16, 2008 (doc. no. 107 at 5,

13). She testified as follows:

> Q: Okay. Tell us everything that you remember about that phone call.
> A: He said he -- he said he was having a real hard time breathing, that he had asked for a door to be opened. I don't know what door. They had some kind of rule, it had to be a certain temperature for that door to be allowed to be opened, and it was just like a couple degrees below that, so they wouldn't do that. And he said he had asked the guard to let him go to the hospital to get a breathing treatment, and they told him to go lay down, he'd be okay.

(Candy Marcum Dep. at 65). There is no specific reference to time in these

comments. Plaintiff repeatedly refers to this testimony to show that Marcum had

breathing difficulties that day (as evidence of "serious medical need") and that an

unidentified guard or guards did not open the door and told Marcum "to go lay

down" at some unidentified time (as evidence of "deliberate indifference") (doc.

no. 107 at 13, 19, 41).[19] Despite relying on the evidence for such purposes, plaintiff

argues (in opposition to the motion to strike) that her testimony is not offered to

prove the "truth of the matter asserted" and therefore is not hearsay. She

contends that her testimony is offered to prove that Marcum "put jail staff on

notice of his condition and of his need for treatment" (doc. no. 119 at 2-3, citing

Kuklica v. City of Cleveland, 1986 WL 17706 (6th Cir. (Ohio)) (per curiam). In the

---

[19] Although plaintiff suggests that an unidentified guard's alleged refusal to violate a jail rule by opening a door in November (presumably to let fresh air in) is evidence of "deliberate indifference," this makes little sense, especially since "cold air" is widely recognized as a common asthma trigger. Plaintiff's brief (doc. no. 107 at 6, fn.2) cites the website www.aaaai.org for "facts about asthma." Such website indicates "common asthma triggers" include "exposure to cold air."

same brief, plaintiff characterizes her testimony as evidence of William Marcum's "intent to obtain treatment" (Id. at 3). Plaintiff further argues that "[e]ven if the statements were hearsay, they are admissible as a hearsay exception under Federal Rule of Evidence 803(3)" (Id., citing Mut. Life Ins. Co. of NY v. Hillmon, 145 U.S. 285, 295 (1892)).

The Magistrate Judge accepted plaintiff's argument that Candy Marcum's testimony was not hearsay and would be admissible "for purposes of demonstrating notice under the Kuklica scenario" (doc. no. 125 at 4-5). The Magistrate Judge recommended that Candy Marcum's testimony could be considered on summary judgment review, and thus, did not reach plaintiff's alternative argument for an exception under Rule 803(3) and/or Hillmon.

The defendants object that the Magistrate's reliance on Kuklica is misplaced and that such case is legally and factually distinguishable (doc. no. 133 at 14). They correctly point out that although plaintiff seeks to impute "notice" to "jail staff" collectively, the Sixth Circuit Court of Appeals has repeatedly rejected this approach. See Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005) (emphasizing that the analysis must focus on what each defendant actually knew); Binay v. Bettendorf, 601 F.3d 640, 650 (6th Cir. 2010) ("each defendant's liability must be assessed individually"). Defendants also note that the alleged phone call reportedly occurred "around noon" when *none of the defendant officers were on duty* (Id. at 8, 12; doc. no. 120 at 2, fn.1). Defendants also assert that it is wrong to attribute "notice" to them when "there is no evidence that Mr. Marcum's alleged

22

statements were relayed to Defendants Lute, Springs, Johnson or anybody else for that matter" (doc. 133 at 15).[20]

In her response to objections, plaintiff recites the Magistrate Judge's conclusions, insists that the testimony "is neither hearsay nor inadmissible," and tries to cast the defense objections as a "relevancy" argument (doc. no. 136 at 13).

First, the Court observes that Candy Marcum's testimony inconsistently refers to the unidentified declarant in both the singular and plural, and improperly seeks to impute "notice" to all the defendants. A vague statement referencing an unidentified "they" at an unidentified time is insufficient to implicate the personal involvement of any particular defendant. As to whether Candy Marcum's testimony is hearsay, the Court observes that several different statements are at issue here. Her testimony that "he said he was having a real hard time breathing" is an out-of-court statement offered to prove the truth of the matter asserted. This fits the definition of hearsay. Such statement would, however, be excepted from the general prohibition against the admission of hearsay by Rule 803(3), which allows a "statement of the declarant's then-existing . . . physical condition (such as mental feeling, pain, or bodily health)." Fed.R.Evid. 803(3).

---

[20] Candy Marcum, despite claiming that her husband said he was "having a hard time breathing," admittedly did nothing to seek help or alert anyone (Candy Marcum Dep. 99-101). This suggests his symptoms at noon were not as "serious" as she now contends, particularly since she acknowledged that her husband had "wheezed" many times in the past and usually resolved it by using an inhaler (Id. at 112-113). In any event, although she argues in her brief about the admissibility of her testimony about hearing him "wheeze" (Candy Marcum Dep. at 106, 111), the defendants point out that they have not challenged such testimony.

With respect to Candy Marcum's further testimony that her husband told her that he had asked an unidentified person to let him go to the hospital to get a breathing treatment and that unidentified persons ("they") told him "to go lay down, he'd be okay," this meets the very definition of hearsay. Merely characterizing this as providing "notice" is just another way of describing the "truth of the matter asserted" under the facts of this case.

Given that the Magistrate Judge accepted the plaintiff's argument about "notice" and relied exclusively on <u>Kuklica</u>, the Court will examine that opinion. There, the trial court excluded the testimony of several witnesses. On appeal, the panel noted that certain testimony had been properly excluded but observed that "with respect to statements which [the arrestee] allegedly made in the presence of the officers, the issue is more difficult." <u>Id</u>. at *5. The opinion then simply stated that the witness' testimony about the arrestee's statement that "she would rather go to the hospital than to jail" was not offered to prove where the arrestee wanted to go, but rather, was "offered to prove that the police officers had notice of the fact that the [arrestee] wanted to go to the hospital." The opinion found it was not hearsay for this purpose, but found no reversible error in the trial court's exclusion of the statement. Even assuming that the hearsay issue in this unpublished per curiam opinion from 1986 was decided correctly, it is not binding authority and has only been cited a single time in over thirty years for the general proposition that "the hearsay rule only excludes extrajudicial statements when they are offered to prove the truth of the matter asserted."

24

Moreover, as defendants point out, <u>Kuklica</u> is factually distinguishable in significant ways. There, the _testifying witness personally heard the initial declarant (the arrestee) make the statement in the presence of officers_, whereas Candy Marcum did _not_ hear any conversation between her husband and the unidentified officers. Candy Marcum only heard him repeat hearsay. Defendants correctly point this out in their objections (doc. no. 133 at 15).

In fact, Candy Marcum's testimony includes hearsay at several levels. She is attempting to use her own testimony (about what her husband allegedly told her about what someone else allegedly said or did) to prove the truth of the matter asserted, i.e. that her husband had requested a breathing treatment, but was told to go lay down by someone (who is not identified). Calling this "notice" of a serious medical need does not avoid the fact that Candy Marcum's testimony amounts to inadmissible double hearsay. It contains an out-of-court statement (William Marcum's) that includes another out-of-court statement (unidentified guard's or guards'). Plaintiff is asking the Court to conclude that Marcum had a "serious medical need" based on the purported "truth of the matter asserted" (i.e., that Marcum allegedly asked for a breathing treatment). She is asking the Court to conclude that the guards were "deliberately indifferent" based on the purported "truth of the matter asserted" (i.e., "they" told him to go lay down when he asked for a breathing treatment).

Plaintiff alternatively argues that her testimony would be admissible under the hearsay exception of Rule 803(3) (doc. no. 119 at 2). While Marcum's statement

that he was "having trouble breathing" could be admissible under the Rule 803(3) exception, his explanation of the circumstances or reasons why are not admissible. See <u>Daniels v. Lafler</u>, 192 Fed. Appx. 408, 424-25 (6th Cir. 2006) (citing with approval the example where the declarant's statement that he was "in pain" was admissible, but not his explanation of the circumstances or reasons why). Plaintiff concedes this (doc. no. 119 at 3 "Defendants are correct that Rule 803(3) allows statements about how the declarant felt, but not about why the declarant felt a certain way.").

The Advisory Committee Notes to the Federal Rules of Evidence state that Rule 803(3) expressly prohibits the use of hearsay statements in this way and that such prohibition is necessary "to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind." Fed.R.Evid. 803(3), Advisory Committee Notes. A party "does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise inadmissible under standard rules of evidence." <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996).

Courts may reject double hearsay when one layer does not fall within a definition of nonhearsay or a hearsay exception. Fed.R.Evid.805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); see, e.g., <u>Kentucky v. Louis Trauth Dairy, Inc.</u>, 1998 WL 199717, *7 (6th Cir. (Ky.)) (affirming exclusion of double

hearsay); <u>White v. Ohio</u>, 2 Fed. Appx. 453, 459 (6th Cir. 2001) (same, finding double hearsay inadmissible where only one level was admissible); <u>Lupo v. Voinovich</u>, 235 F. Supp. 2d 782, 793 (S.D. Ohio 2002) ("both levels of hearsay must be admissible prior to admitting such double hearsay into evidence"). The Court finds that this portion of Candy Marcum's testimony is inadmissible hearsay and is not subject to the exception of Rule 803(3).

The Court also finds that plaintiff's reliance on <u>Hillmon</u> is misplaced. The <u>Hillmon</u> exception renders statements of intent by a declarant admissible only to prove his future conduct. <u>Hillmon</u>, 145 U.S. at 295. Contrary to plaintiff's suggestion, William Marcum's alleged statements refer to past events, not any intended "future conduct." Plaintiff has not shown that this inadmissible hearsay is properly subject to any exception, and thus, it may not be considered on summary judgment review. See <u>Wiley v. United States</u>, 20 F.3d 222, 226 (6th Cir. 1994) (only admissible evidence may be considered).

In sum, for purposes of summary judgment , the Court will consider Candy Marcum's deposition testimony that her husband told her he was having "a real hard time breathing" pursuant to the hearsay exception of Rule 803(3), but will not consider the remaining portion of her testimony (i.e., the inadmissible double hearsay about what her husband allegedly told her that another unidentified person or persons allegedly did or said).

### B. Alleged Spoliation of Phone Recording

Plaintiff asks for an adverse inference because the recording of the alleged

phone call on November 16, 2008 was automatically purged after one year pursuant to the standard retention policy of Scioto County's telephone vendor, Securus Technologies (doc. no. 107 at 35, 38, 43).[21] Defendants contend that plaintiff is not entitled to any adverse inference (doc. no. 111 at 7-11).

Federal law of spoliation applies to cases litigated in federal court. Adkins v. Wolever ("Adkins I"), 554 F.3d 650, 653 (6th Cir. 2009) (en banc). The Sixth Circuit Court of Appeals has explained that:

> "A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

Flagg v. City of Detroit, 715 F.3d 165, 177 (6th Cir. 2013) (citing Beaven v. U.S. Dept. of Justice, 622 F.3d 540, 553 (6th Cir. 2010)). If spoliation occurred, the district court may consider, under its inherent authority, whether negligence or bad faith motivated the defendants and what sanction, if any, should be imposed. Adkins I, 554 F.3d at 653 (the district court has "broad discretion to craft proper sanctions").

The Magistrate Judge found that the phone recording was purged "in the ordinary course of business" and that the defendants did not destroy it "in bad faith" (doc. no. 125 at 15). The Court agrees with this assessment of the evidence.

---

[21]  Plaintiff did not plead an independent tort *claim* of "spoliation" under Ohio law. The Magistrate Judge correctly noted this and cites the applicable federal law for a party's request for sanctions due to spoliation (doc. no. 125 at 13).

See <u>Beaven</u>, 622 F.3d at 554 (observing that it is significant whether the information was destroyed "in the course of regular business practice"). The Magistrate Judge nonetheless indicated that plaintiff should be given the benefit of an adverse inference due to "negligent" spoliation of the phone recording. She based this on the Sheriff's request for a BCI investigation and the fact that Marcum's family hired counsel "close in proximity" to Marcum's death. She indicates this should have alerted the defendants to "potential" litigation.

These limited facts are insufficient to entitle plaintiff to an adverse inference. Defendants point out that even if litigation appeared likely, they did not know of the existence of the phone call or its alleged significance to this case, and therefore the defendants each lacked a "culpable state of mind." The evidence does not establish that the County, as the party having control over the evidence via its third party vendor, had an obligation to preserve the phone recording at the time it was purged. No evidence suggests that any individual officers had any control over the recordings. See <u>Adkins v. Wolever ("Adkins II")</u>, 692 F.3d 499, 506 (6th Cir. 2012) ("Wolever was not culpable because he had no control over the evidence. This conclusion was not clearly erroneous."); <u>Perryman v. Postmaster General</u>, 475 Fed.Appx. 585, 588 (6th Cir. 2012) (affirming denial of adverse inference because plaintiff did not show that defendants were required to preserve the information or that they discarded it "with a culpable state of mind").

Significantly, the record reflects that plaintiff declined an interview with the BCI investigator in 2008, at which time she (or her counsel) could certainly have

29

notified the jail of the existence of the alleged phone call and the need for retention, thereby avoiding any automatic purging in the following year. Plaintiff waited almost two years to file suit and ask for a copy of the phone recording, at which time the phone recording no longer existed. In response to plaintiff's request (dated October 15, 2010) for all audio recordings of telephone calls to or from Marcum during his incarceration, the Sheriff advised by letter on October 22, 2010 that audio recordings are retained for one year and then automatically purged by third party Securus Technologies (doc. no. 111-2 at 1-2); see <u>Sims v. Securus Tech.net Connection</u>, 2014 WL 1383084, *5, fn.5 (E.D.N.Y.) (observing that the website for this private company - https://securustech.net - indicates it "install[s] and centrally manage[s] state-of-the-art call management and communication systems for use by correctional facilities").

After plaintiff learned of the automatic purge, she alleged the existence of the November 16 phone call for the first time. Defendants point out that Securus Technologies has not been able to confirm that the alleged call was actually made (doc. no. 111 at 3, fn. 3 "the phone vendor cannot locate a record of any inmate making a call to plaintiff at her listed number of 740-353-9519 on November 16, 2008"). Even assuming that the alleged phone call actually occurred and that plaintiff has accurately testified about the contents of the conversation, she has not shown that the County was obliged to preserve recordings of jail phone calls beyond one year, particularly in the absence of any request to do so.

Defendants point out that plaintiff "sat on this issue for years and then, well

after the close of discovery, and in the midst of summary judgment briefing, raised it for the first time" (doc. no. 133 at 25, objecting that "such eleventh-hour tactics are improper"). Defendants object that plaintiff's "dilatory tactics should not have been tolerated by the Magistrate Judge" (Id. at 27). Defendants cite cases where federal courts have refused to grant an adverse inference based on the plaintiff's delay in asserting spoliation. See, e.g., Gioia v. Forbes Media LLC, 2011 WL 4549607, *3 fn.2 (S.D.N.Y.) (denying plaintiff's request for an adverse inference for alleged spoliation due to a delay in imposing a litigation hold because plaintiff had first raised the spoliation issue in opposition to summary judgment; the court held that "because plaintiffs had ample time to raise such a claim during or after discovery, plaintiffs' request is denied as untimely"), aff'd by 501 Fed.Appx. 52 (2012); Ferrone v. Onorato, 2007 WL 2973684, *10 (W.D.Pa.) ("it was incumbent upon [plaintiff] to seek redress [for alleged spoliation of evidence] through an appropriate discovery motion. His complaints come too late, and the court cannot now resolve such a serious accusation through its consideration of papers submitted in opposition to summary judgment"), aff'd by 298 Fed.Appx. 190 (3rd Cir. 2008). Although plaintiff responds that the defendants "have not produced any caselaw to support his (sic) proposition" (doc. no. 136 at 14), the record reflects otherwise.

Defendants point out that they preserved the 3rd shift video (which had obvious relevance), but had no reason to know of the existence of the alleged phone call, much less that it might have had any relevance to this case. The

31

retention policy of one year appears reasonable. See <u>Burgess v. Fischer</u>, 735 F.3d 462, 482 fn.5 (6th Cir. 2013) (finding that a retention policy of only five days was unreasonable, and observing that the jail incident "alone would not be sufficient to place defendants on notice of probable litigation if they had waited weeks or months to destroy the tape"). In their objections, defendants cite to factually similar cases where district courts denied adverse inferences (doc. no. 133 at 29, citing <u>Stanfill v. Talton</u>, 851 F. Supp.2d 1346, 1365 (M.D. Ga. 2012) (observing that plaintiff filed suit almost two years after Stanfill's unfortunate death, and that "there is no evidence in the record that the plaintiff requested that the defendants impose a litigation hold" on the videotape).  Defendants contend that plaintiff has not met the requirements under federal law for seeking an adverse inference (doc. no. 133 at 24-31). The Court agrees, and given the facts and procedural posture of this case, will modify the R&R insofar as the Court will not impose the sanction of an adverse inference for the routine purging of this alleged phone call. See e.g., <u>Adkins II</u>, 692 F.3d at 506 (affirming denial of request for adverse inference based on alleged "negligent spoliation").

### C. the Adams Statement

Next, in opposing summary judgment, plaintiff seeks to rely on unsworn statements made by former inmate Tommy Adams to BCI Agent Rohrer during his investigation of Marcum's death (doc. no. 107 at 43-45, citing to doc. no. 31-5, "Interview of Tommy Adams"). On December 12, 2008, Agent Rohrer interviewed Adams at Adams' residence at 3116 Richard Rd., Portsmouth, Ohio. The interview

was not under oath, and the 18-page transcript of that interview does not indicate that it was prepared and certified by a court reporter.[22] Plaintiff states that her counsel has not been able to locate Adams "on multiple occasions" (Id. at 47). Plaintiff therefore seeks to rely on Adams' unsworn interview to show that:

> Marcum approached an officer around 5:30 on November 16 requesting a breathing treatment and that he was refused any assistance. Adams then assisted Mr. Marcum to his bed, and Mr. Marcum's asthma symptoms proceeded to worsen. Approximately an hour later he requested an inhaler from the same officer.

(Id. at 41-42). Plaintiff acknowledges that these statements are hearsay, but urges that such evidence is admissible under the residual hearsay exception of Fed.R.Evid. 807, which provides:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed.R.Evid. 807; see United States v. Barlow, 693 F.2d 954, 961–63 (6th Cir. 1982), cert. denied, 461 U.S. 945 (1983) (holding that testimony of an unavailable witness

---

[22] While a transcript certified by an official court reporter "shall be deemed prima facie a correct statement of the testimony taken and the proceedings had," 28 U.S.C. § 753(b), the transcript relied on by plaintiff contains no such indicia and merely indicates the unsworn interview was transcribed by a person named "Valerie Todd."

"under certain circumstances" may still be admissible under Rule 807). Plaintiff argues that all four factors are met. Plaintiff contends that this former inmate's statements are "trustworthy" because the interview was conducted by a police officer one month after Marcum's death and because Adams had "nothing to lose or gain in connection with this interview" (doc. no. 107 at 48).[23]

Defendants assert that the unsworn interview of this convicted felon lacks the "equivalent circumstantial guarantees of trustworthiness" required by Rule 807. They point out that various statements by Adams are demonstrably false, including (1) Adams' incorrect statement that the same corrections officer was on duty in the dorm for the entire 2nd shift; (2) Adams' incorrect statement that he walked up to the CO's desk with Marcum right before Marcum's collapse (the 3rd shift video plainly refutes this); and (3) Adams' incorrect statement that the same corrections officer was still on duty during 3rd shift when Marcum collapsed (doc. no. 111 at 7, fn. 6).[24]

The Magistrate Judge correctly recognized that the residual hearsay exception of Rule 807 "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is

_____

[23] The fact that a police officer interviewed a person says nothing about whether that person is reliable source of information.

[24] Adams did not identify the officer by name, but describes him as having: "black hair, was kinda short and stocky ... I'd say he was in his late twenties maybe" (doc. no. 31-5 at 5). Defendants note that Officer Lute was on duty then, but does not match this description. In fact, none of the 2nd shift officers match such description: Officer Lute is 5'10 with brown hair; Officer Johnson is 6'1 with red hair; and Officer Springs is 6'2 (doc. no. 133 at 15).

material, probative and necessary in the interest of justice" (doc. no. 125 at 6). She then accepted plaintiff's argument that the uncertified transcript of Adams' unsworn interview met all four factors and that his statements were admissible under Rule 807 (doc. no. 125 at 6-11).

The main bone of contention in the objections concerns the Magistrate Judge's discussion of "trustworthiness" under factor (1). The Magistrate Judge indicated that Adams was an inmate in November 2008 with "firsthand knowledge," that there was no evidence he had any "animosity" toward the jail or guards, that he was a "disinterested party," that he did not provide his statement to Agent Rohrer "voluntarily," and that there is "no evidence" that Adams made "inconsistent statements" about the events (doc. no. 125 at 7-9). The Magistrate Judge deemed the false statements identified by defendants to be "de minimus contradictions" and indicated that the defendants had not pointed to evidence in support (Id.).

The defendants, however, did specifically point to the 3rd shift videotape (doc. no. 76) which refutes Adams' claim that he accompanied Marcum to the CO's desk when he collapsed (doc. no. 111 at 7, fn. 6). Evidence proving that a "first hand witness" was not where he claimed to be at a relevant time is hardly a "de minimus contradiction" for purposes of determining the "trustworthiness" of his unsworn allegation. In their objections, the defendants point out that Adams was under indictment for a felony drug charge in Scioto County and that his potential bias against the County defendants is obvious (doc. no. 133 at 18). Defendants

also point out that the Magistrate Judge erroneously indicated that Adams' statement was not voluntary (Id.). Adams agreed to be interviewed and was not incarcerated at the time. The record reflects that Marcum's own family declined to be interviewed, thus establishing the "voluntariness" of the requested interviews.

To the extent the Magistrate Judge accepted plaintiff's arguments that the trustworthiness of Adams' statements were "supported" by Candy Marcum's phone call (doc. no. 107 at 8, "plaintiff's testimony supports Inmate Adams' statements that Marcum requested and was denied ... a breathing treatment"), this portion of plaintiff's testimony about the phone call is inadmissible hearsay, and in any event, does not support Adams' statement. Candy Marcum indicated her phone call occurred *around noon* on November 16, and thus, it is *impossible* for her (or her husband) to have been discussing events that had not occurred yet. Contrary to "providing necessary guarantees of trustworthiness," this emphasizes the reason why unsworn statements not subject to cross-examination typically lack trustworthiness and are rarely admitted.

That said, the Court agrees with the Magistrate Judge that Adams gave relevant statements in his interview that have some indicia of trustworthiness under the circumstances. Adams was housed in the same area of the jail and indicates that from where he was laying in bed that evening, he could see that Marcum was pale and white and could hear him making labored breathing sounds and that it was getting worse and worse that evening (doc. no. 31-5 at 8). This is

similar to inmate White's testimony.[25]

Even if the hearsay testimony is deemed sufficiently trustworthy, Rule 807 also requires that the statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Darwhich, 337 F.3d at 660 fn.20 (quoting Rule 807). Given that plaintiff was thereafter unable to locate Adams to be a witness and given that the videotape of the 2nd shift is not available due to equipment failure, Adams' interview with the BCI agent, though unsworn, is likely "more probative" than any other evidence here. As to whether plaintiff made "reasonable efforts" to obtain "any other evidence," defendants object that plaintiff has not indicated what efforts she made "to identify and locate other inmates housed with Marcum" (doc. no. 133 at 18-19). The jail dorm housed approximately 60 inmates, and there would presumably be numerous potential witnesses if Marcum's breathing was in fact audibly labored during the 2nd shift. Plaintiff does not indicate what efforts she has made to obtain the testimony of any such witnesses. The defendants correctly object that the Magistrate Judge did not consider this (doc. no. 133 at 19, citing to doc. no. 125 at 10).

As to whether plaintiff made "reasonable efforts" to find Adams, plaintiff's brief merely states that "plaintiff's counsel cannot locate him" (doc. no. 119 at 5),

---

[25] Despite the lengthy briefing on these issues, and despite the fact that plaintiff asserts that Adams' unsworn statement is the only evidence that Marcum ever requested a "breathing treatment," plaintiff suggests that "the outcome of the Motion to Strike is largely immaterial to this Court's summary judgment determination" (doc. no. 136 at 13, fn.6).

but again, does not indicate what "efforts" were actually made. The Magistrate Judge accepted plaintiff's conclusory assertion (doc. no. 125 at 7). Defendants object that "[a]ll plaintiff provides is a conclusory statement that she cannot find Mr. Adams" (doc. no. 133 at 18). At the hearing on objections, defense counsel questioned whether plaintiff had in fact made "reasonable efforts" to locate Adams and pointed out that they had managed to locate him at least once. While a party's good faith attempts to locate and subpoena a witness will satisfy the obligation to prove "unavailability," see Elnashar v. Speedway SuperAmerica, 484 F3d 1046, 1057 (8th Cir. 2007), a witness generally will not be found "unavailable" where no attempt has been made to depose him, United States v. Gabriel, 715 F2d 1447, 1451 (10th Cir. 1983) (affirming exclusion of hearsay statement on such basis).

This brings us to the fact that the record now reflects a "Notice of Deposition" for Adams (doc. no. 141). His deposition was apparently taken on July 28, 2014. Nothing before this Court suggests that Adams is presently unavailable as a witness. Now that Adams has been located and deposed under oath, the parties have his actual testimony and have cross-examined him. While his prior unsworn interview is no longer "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," it does indicate the likely content of his deposition testimony. In light of this new development (which the Magistrate Judge did not have an opportunity to consider), and given that the Court does not presently have the benefit of Adams'

38

deposition transcript, the Court will consider Adams' BCI interview for purposes of summary judgment.

### D. Alleged Spoliation of 2nd Shift Video Recording

Plaintiff seeks the benefit of an adverse inference due to alleged spoliation of the 2nd shift videotape. Defendant opposes such request. Upon the Sheriff's request, BCI investigated the incident. The videotape of the 3rd shift (i.e. the footage of the severe asthma attack and resuscitation efforts) was promptly preserved and provided to BCI, and later, to plaintiff. When Agent Rohrer learned during interviews over the following month that the 2nd shift videotape might have relevance, he requested it, but it was not available due to machine malfunction. The video machine had been sent out for repair on December 18, 2008 (doc. no. 111, Exs. 4-6 maintenance records indicating hard disk drive failure). The technology firm was unable to recover that recording.

No evidence suggests any willful or deliberate destruction of the videotape. With respect to "negligent spoliation," the Magistrate Judge indicated that the videotape "is relevant to plaintiff's claim" and that "Marcum's death should have put them on notice that litigation was reasonably foreseeable" (doc. no 125 at 13-15). Defendants object that "[s]imply showing that evidence which might be relevant to a claim was lost is not enough to prove spoliation, but that is all plaintiff presented" (doc. no. 133 at 27). Defendants point out that plaintiff is not entitled to an adverse instruction based merely on equipment failure.

39

To the extent the Magistrate Judge indicates that the defendants "negligently" failed to preserve the 2nd shift videotape prior to the equipment failure, defendants point out in their objections that the primary focus of the initial investigation was on the immediate circumstances surrounding Marcum's severe asthma attack and resuscitation efforts during the 3rd shift (doc. no. 133 at 30, observing that the videotape of those events was preserved and provided). They assert that "at the time of death, nobody had interviewed Tommy Adams and, as such, had no reason to believe that events which [allegedly] took place 7 hours earlier might have had an impact on Marcum's death" (Id.). In other words, the alleged relevance of the 2nd shift videotape was not apparent until the BCI Agent subsequently asked for it (based on the December 12, 2008 interview of Adams). At such time, the equipment had already malfunctioned. Defendants urge that the Magistrate Judge's hindsight approach to the videotape's relevance is erroneous. Defendants also point out that the 2nd shift officers (Lute, Johnson and Springs) did not delete or have any control over the videotape at issue (doc. no. 111 at 9-11); see Adkins II, 692 F.3d at 506 (finding that officer "was not culpable because he had no control over the evidence"). Defendants correctly point out that the adverse inference requested by plaintiff would "punish individual employees for actions they had no control over" (doc. no. 133 at 31). The Court agrees. Under these circumstances, plaintiff is not entitled to a jury instruction by the Court requiring an adverse inference for alleged "negligent spoliation." The parties may, of course, argue all inferences supported by the evidence.

40

## IV. Summary Judgment Standard

The Court will next consider the three motions for summary judgment. Rule 56(a) of the Federal Rules of Civil Procedure provides in relevant part:

> A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

The moving party bears the burden of proving that no genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. Id. at 587. In doing so, courts must distinguish between evidence of disputed material facts and mere "disputed matters of professional judgment," i.e. disagreement as to legal implications of those facts. Beard v. Banks, 548 U.S. 521, 529 30 (2006).

On summary judgment review, the court must determine whether the evidence presents a sufficient dispute of material fact so as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." <u>Id</u>. at 248. A mere scintilla of evidence in support of a party's claim is insufficient to survive summary judgment, as there must be enough evidence that a jury could reasonably find for the party. <u>Id</u>. at 252. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

<u>V. Relevant Law</u>

<u>A. Section 1983 and Eighth Amendment Claims</u>

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. Plaintiff asserts violation of the Eighth Amendment, which prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. The Supreme Court has explained that "an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976). Deliberate indifference to the serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. <u>Id</u>. at 104 (explaining that "t]his is true whether the indifference is manifested by prison doctors in their

response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.").

The Supreme Court has emphasized, however, that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 105. While inmates are entitled to adequate medical care, the Eighth Amendment does not guarantee them "unqualified access to health care." Hudson v. McMillian, 503 U.S. 1, 9 (1992). "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.' " Alspaugh v. McConnell, 643 F.3d 162, 169 (6th Cir. 2011) (quoting Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)).

A constitutional claim of "deliberate indifference to serious medical needs" has an objective component, which requires plaintiff to show a "sufficiently serious" medical need, and a subjective component, which requires a showing of a sufficiently culpable state of mind, i.e. "deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834-842 (1994). The term deliberate indifference describes "a state of mind more blameworthy than negligence." Id. at 835. Prison officials may be held liable only if they know that inmates face "substantial risk of serious harm" and disregard that risk by failing to take reasonable measures to abate it. Id. at 828. The official need not have acted with the purpose of causing harm or knowing that harm will result. Rather, "the official must both be aware of facts

43

from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Id. at 896.

### B. Qualified Immunity

Qualified immunity is an affirmative defense that must be pleaded by a defendant official. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). Government officials may invoke qualified immunity as a defense only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The qualified immunity doctrine seeks to balance two competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. Qualified immunity is intended to shield actions that are reasonable in light of current law without protecting abuses of office. Anderson v. Creighton, 483 U.S. at 638, 646 (1987). Qualified immunity protects government officials from liability for objectively reasonable mistakes, regardless whether the error in question is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231 (quoting Harlow, 457 U.S. at 818); Dunigan v. Noble, 390 F.3d 486, 491 (6th Cir. 2004) ("Implicit in the qualified immunity doctrine is a recognition that ... officers, acting reasonably, may err").

To determine whether state officials are entitled to qualified immunity, the Court must consider: (1) whether, considering the evidence in the light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established at the time. Santiago v. Ringle, 734 F.3d 585, 593 (6th Cir. 2013). The court may address either question first. Pearson, 555 U.S. at 236. In determining whether a right is "clearly established," the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." Saucier, 533 U.S. at 202. This question must be answered "in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 201). Plaintiff has the burden of showing that the defendant is not entitled to qualified immunity. Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009). Plaintiff has the burden of showing that the right is clearly established, while defendant has the burden of showing that the challenged acts were objectively reasonable in light of the law existing at the time. Id.

## VI. the "Motion for Summary Judgment" (doc. no. 82) by Dr. Walker

### A. Whether Dr. Walker May Raise the Defense of Qualified Immunity

Dr. Walker asserts that he is entitled to qualified immunity (doc. no. 82 at 12-13), while plaintiff contends that "a private doctor working for the government" is not entitled to qualified immunity (doc. no. 107 at 14, 39). A physician, like Dr. Walker, who contracts to provide medical services to prison inmates acts under color of state law for purposes of § 1983. West v. Atkins, 487 U.S. 42, 54 (1988).

45

Although a prison doctor is amenable to suit under § 1983, plaintiff contends that, based on the decision in <u>McCullum v. Tepe</u>, 693 F.3d 696 (6th Cir. 2012), Dr. Walker may not assert the qualified immunity defense. There, a panel of the Sixth Circuit Court of Appeals held that the defense of qualified immunity was not available to a psychiatrist "employed by an independent non-profit organization, but working part-time for the County as a prison psychiatrist." <u>Id</u>. at 704. In a footnote, the Magistrate Judge agreed with plaintiff's assertion under <u>McCullum</u>, but provided no further analysis (doc. no. 125 at 28, fn. 12).

The Magistrate Judge is correct insofar as a published decision in the Sixth Circuit is binding on this Court if that decision is factually and legally similar. That said, the Court observes that, before and after <u>McCullum</u>, the Sixth Circuit Court of Appeals has rendered decisions where the defense of qualified immunity was deemed available to prison physicians. See, e.g., <u>Santiago</u>, 734 F.3d at 593 (post-<u>McCullum</u> case, affirming grant of qualified immunity to prison physician); <u>Reilly v. Vadlamudi</u>, 680 F.3d 617 (6th Cir. 2012) (pre-<u>McCullum</u> case, reversing the denial of qualified immunity to prison physician); <u>Titlow v. Corr'l Med. Servs., Inc</u>., 507 Fed.Appx. 579, 587 (6th Cir. 2012) (post-<u>McCullum</u> case, reversing denial of qualified immunity to Dr. Pandya and explaining that a "government doctor merits qualified immunity if "he has merely made a reasonable mistake in his medical judgment," but "he is not entitled to such immunity if he correctly perceived all the relevant facts, understood the consequences of such facts, and disregarded those consequences in his treatment of a patient") (quoting <u>LeMarbe v. Wisneski</u>, 266

F.3d 429, 440 (6th Cir. 2001), cert. denied, 535 U.S. 1056 (2002). In <u>LeMarbe</u>, the Sixth Circuit Court of Appeals discussed the "venerable rule in this circuit that one panel may not overrule the published precedent of another panel."

In any event, Dr. Walker concentrates his objections on the Magistrate Judge's analysis of the objective and subjective components of the plaintiff's "deliberate indifference" claim against him under § 1983.

**B. The Parties' Arguments and the Magistrate Judge's Recommendations on the § 1983 Claim against Dr. Walker**

Dr. Walker moves for summary judgment, asserting that the medical care provided to Marcum did not amount to "deliberate indifference to serious medical needs" under the Eighth Amendment (doc. no. 82). He asserts that on October 16, 2008, Marcum made a reasonable request for specific and appropriate medication that he had previously taken for asthma. Dr. Walker responded to Marcum's written request and provided him with that medication (and several refills). Marcum's bunk-mate (White) indicates that Marcum obtained relief from his symptoms when he used the Albuterol inhaler provided by Dr. Walker. Marcum was offered but declined a physical examination and made no further written requests for care. Dr. Walker asserts that Marcum did not experience a serious medical need until he had a severe asthma attack from an acute allergic reaction on the evening of November 16-17, at which time emergency medical treatment was provided. Dr. Walker was not involved in the events of that evening.

Plaintiff opposes summary judgment, alleging that Marcum's medical

treatment up to that point was constitutionally inadequate because he should have had a physical examination and had his vitals taken and "monitored" (doc. no. 107 at 6, 12, 19). Plaintiff urges that the failure to do so was a breach of the "standard of care," as described by plaintiff's medical witness, and asserts that "the standard of care for asthma was continually violated, causing Mr. Marcum's death" (Id. at 37). She contends that Marcum's death is proof that his asthma was a "serious medical condition."

The Magistrate Judge recommended that Marcum's asthma was objectively a "serious medical condition" for purposes of the Eighth Amendment claim (doc. no. 125 at 24-25). She based this largely on the fact that Marcum had reported he had asthma and was "starting to have attacks," was prescribed medication, and later died "due in part to experiencing an asthma attack" (Id. indicating "the seriousness of Marcum's condition is further underscored by Marcum's autopsy identifying the cause of death as status asthmaticus"). As to the subjective component, the Magistrate Judge recommended that although Dr. Walker had approved Marcum's specific request for Albuterol tablets (2x) and an inhaler (and refills) for his asthma, and although Marcum subsequently refused the offered physical examination and made no further written requests for any care, there was nonetheless "a genuine dispute as to whether Dr. Walker acted with deliberate indifference" (Id. at 25). The Magistrate Judge based this recommendation largely on the plaintiff's argument (see doc. no. 107 at 24, 36) that the "level of care" was "inadequate" because he was not personally examined by the physician to take

his "vitals" due to alleged "systemic dysfunction."[26] The Magistrate Judge relied heavily on selected testimony of plaintiff's opinion witness about the "standard of care" that allegedly "should have been provided" (doc. no. 125 at 27, citing King Dep. at 6-8). The Magistrate Judge recommended that Dr. Walker's motion for summary judgment on the § 1983 claim be denied.

### C. Dr. Walker's Objections

In his objections, Dr. Walker points out that the R&R incorrectly indicated that various facts were "disputed," when in fact, the evidence reflects no dispute as to those facts (doc. no. 132 at 2). For example, he points out that there is no dispute as to the autopsy finding of Valium metabolite in Marcum's body, no dispute as to the intermittent seasonal nature of Marcum's asthma prior to his 2008 incarceration, and no dispute as to whether Marcum had "regularly" been taking any asthma medication before being incarcerated in 2008. He asserts that "the alleged disputed fact of Mr. Marcum taking benzodiazepine drugs within 24 hours of his death is not disputed at all" (Id.). The R&R apparently indicated that such facts were "disputed" based solely on plaintiff "red-lining" of various proposed findings, even though plaintiff lacked any evidentiary basis to properly dispute those facts. In the present order, the Court has already addressed such discrepancies and relied on the actual evidence, not any description of it.

---

[26] In characterizing the medical program this way, plaintiff relies largely on signed releases where inmates declined physicals and on her own criticism of the procedure whereby corrections officers initialed the log when dispensing a prescribed tablet or noted an "R" for an inmate's refusal.

For example, the evidence indicates that in the past decade, Marcum's asthma symptoms were controlled with occasional use of an over-the-counter inhaler (Candy Marcum Dep. at 32, Q: Was he on any medication? A: Not regularly, no. It was under control. He would have a spell maybe once or twice a year when the weather changed. Q: And when you say spell, what do you mean? A: Like he would start getting shortness of breath. Typically he controlled it with over-the-counter Primatene Mist.). The medical testimony indicates that when Marcum entered the Scioto County Jail, he had a history of occasional ("intermittent") asthma (Wilcox Dep. at 60 indicating that based on the medical records, "I would say he had intermittent asthma"). The medical records indicate that Marcum did not take any asthma medication while incarcerated in 2003-04. Marcum indicated at his 2008 booking that he had asthma, but was not taking any medication (doc. no. 66-1, Questionnaire Response # 19). There is no "genuine dispute" about these facts.

In his objections, Dr. Walker also points out that "there are relevant and important unopposed facts in this case that the R&R completely fails to address or discuss" (doc. no. 132 at 1). For example, he points out that the R&R fails to mention Dr. Looman's testimony about the highly significant fact that Marcum died from "status asthmaticus due to an allergic reaction" (Id. at 2-3). He points out that Dr. Looman's testimony on this important fact, as well as Dr. Parker's consistent testimony on the same subject, are ignored by the R&R, despite the fact that Dr. Walker discussed these matters at length in his motion for summary

judgment and cited to relevant testimony of Drs. Looman and Parker (<u>Id</u>.). Such objection has merit. The Court, in conducting its *de novo* review, has carefully considered the record, including the testimony of these witnesses.

Dr. Walker further objects that the R&R "cites to an improper legal standard and analyzes the deliberate indifference claim of Plaintiff contrary to the law in the 6th Circuit" (<u>Id</u>. at 1). Specifically, he contends that the R&R appears "to turn deliberate indifference into a "mere negligence" standard" and "has converted the deliberate indifference standard into nothing more than plain malpractice" (<u>Id</u>. at 4-5). Dr. Walker correctly points out that plaintiff is complaining of the adequacy of treatment provided. Although the R&R accepted plaintiff's argument that Dr. Walker should have taken Marcum's "vital signs" and a more comprehensive history during a physical examination (even though the record reflects that Marcum declined the offered examination), Dr. Walker points out that these criticisms concern "the adequacy of Dr. Walker's response to the request for medication" (<u>Id</u>. at 6-7). It is well-settled that "where a prisoner alleges only that the medical care he received was inadequate, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." <u>Alspaugh</u>, 643 F.3d at 169 (quoting <u>Westlake</u>, 537 F.2d at 860 n. 5). Dr. Walker points out that the R&R relied on Dr. King's opinion testimony about "the standard of care" to challenge the adequacy of care as if the § 1983 claim were merely a negligence claim (<u>Id</u>. at 6). He correctly asserts that to withstand summary judgment on a constitutional Eighth Amendment claim for

"deliberate indifference to serious medical needs," plaintiff must show more than "simple negligence" (Id.).

Dr. Walker points out that the R&R failed to distinguish between merely having a past diagnosis of "asthma" and a severe asthma attack (doc. no. 132 at 4). In his motion, Dr. Walker had pointed to numerous cases where courts have found that although a person may have been diagnosed with asthma in the past, it does not necessarily rise to the level of a "serious medical need" at all times (doc. no. 82 at 9, citing Harris v. Anderson, 2009 WL 1850446 (E.D.Tenn.) (observing that inmate's "asthma ... was not necessarily a serious medical need"). The other defendants make the same point in their motion and objections (doc. nos. 77 at 13-14; 133-1 appendix of cases). Research reflects numerous such cases. See, e.g., Jones v. Caruso, 421 Fed.Appx. 550, 552 (6th Cir. 2011) (dismissing 8th Am. claim because the evidence indicated that plaintiff had asthma, but his symptoms were "relatively minor" and could be managed "with the use of his inhalers and other medication"); Williams v. Rodriguez, 509 F.3d 392 (7th Cir. 2007) (observing that "the facts, when viewed in the light most favorable to Williams, fail to show that his asthma was sufficiently severe during processing to be considered objectively serious for purposes of his deliberate indifference claim"); Wright v. J&S Extradition Services, LLC, 2012 WL 1681812 (M.D.Tenn.) ("Asthma that can be managed with the use of inhalers and other medication is not a serious health condition for the purposes of the Eighth Amendment."); Harris v. Anderson, 2009 WL 1850446 (E.D.Tenn.) (plaintiff had chronic asthma, but it was the acuteness of

52

an "actual asthma attack" that could "amount to a sufficiently serious condition"); Stoneman v. Thompson, 2005 WL 3881432, * (E.D.Va.) (granting summary judgment because "the record does not indicate that plaintiff's asthma was a serious condition, but instead demonstrates that it was well-controlled without the need for more rigorous monitoring"); Lewis v. Clarkstown P.D., 2014 WL 1364934, *7 (S.D.N.Y.) ("While merely being an asthmatic -- a person susceptible to asthma attacks -- is not a condition, in Eighth Amendment parlance, that is severe or sufficiently serious, courts distinguish the mere existence of the condition ... from the situation in which an inmate is suffering an actual attack") (citing Patterson v. Lilley, 2003 WL 21507345, at *4 (S.D.N.Y.)); Thomas v. Mikell, 2008 WL 2156362, *2 (S.D.Ga.) ("It is common knowledge that some asthma "attacks" are mild and brief in duration, while others are severe, prolonged, and even life threatening. Courts recognize this distinction ...").

Dr. Walker objects that the R&R failed to account for this (doc. no. 132 at 4, asserting that the R&R "lumps the time frame for serious medical condition to the entire period" and "seems to conclude that it is deemed to be ongoing even when a response occurs and no further need becomes apparent"). The medical testimony in the present case agrees that asthma can vary in severity over time (King Dep. at 20, observing that asthma has degrees of severity, including "mild," "intermittent," or "moderate;" Exline Dep. at 49, pointing out that many patients

will have a "flare once every few years" and seek an inhaler at that time;[27] Wilcox Dep. at 62, indicating "So you may have a patient who, as I said, has very mild asthma overall, and then they can develop status asthmaticus acutely."). Dr. Thomas Parker, M.D., who is board-certified in internal medicine, pulmonary medicine, and critical care medicine, indicated that patients "can go weeks or months or years between asthma attacks ... when you begin to have trouble with your asthma, you call the physician and ask for a refill of medication (Parker Dep. at 43). He indicated that asthma can be serious, but generally is not (Id. at 102). Dr. Walker objects that the R&R did not properly take this matter of "timing" into account (doc. no. 132 at 4).

Dr. Walker points out that the R&R paid little attention to the important fact that Dr. Looman testified that Marcum actually died of status asthmaticus *from an acute allergic reaction* (doc. no. 132 at 2-3). The evidence reflects that status asthmaticus can develop suddenly and is very different in severity than mild or intermittent "asthma" that is typically controlled with medication, such as Albuterol (King Dep. at 22 indicating that in some patients, "status asthmaticus can develop quite rapidly within a period of hours"; Exline Dep. at 62 "you may have a patient who ... has very mild asthma overall, and then they can develop

---

[27]  See Exline Dep. at 38-39: A: So generally we grade asthma on how often you get symptoms. So if you get asthma symptoms once a week, then you would say that's intermittent. If it's a few times a week, two or so, then that would be more mild. If you're getting them every day, that would be moderate. If you're getting them many times during the day, that would be severe ... So there's degrees of asthma in terms of how severe the limitation to your breathing is, and then also there's degrees of how often you get those feelings.

status asthmaticus acutely"). Dr. Walker objects that the R&R fails to account for this important distinction and that the R&R improperly relied on Marcum's death as hindsight proof that he had a "serious medical need" during an earlier period of time. See, e.g., Thomas, 2008 WL 2156362, *2 ("mild asthma of short duration is simply not a "serious medical need" that satisfies the objective component of an Eighth Amendment claim"). Plaintiff's own medical witness acknowledges that a person can be given appropriate medical care for asthma but still die from sudden status asthmaticus due to an acute allergic reaction (King Dep. at 30: Q. Are you aware of asthma patients who have died from asthma attacks or status asthmaticus despite the best of medical care? A. Yes.). Defense witness Dr. Wilcox agreed (Wilcox Dep. at 84, "[m]any patients with asthma die even with excellent healthcare").

Even assuming that Marcum's initial request for Albuterol and an inhaler on October 16, 2008 demonstrates the existence of a serious medical need, Dr. Walker was not indifferent to this request. He responded by prescribing the Albuterol tablets (2x) and Albuterol inhaler that Marcum specifically requested. Plaintiff's own opinion witness, Dr. King, describes this as "typical frontline treatment for asthma" (King Dep. at 20: Q: Is there a typical frontline treatment for asthma? A: There are typical frontline treatments, some of which include medications called short-acting bronchodilators like albuterol and some of which are medications that are called corticosteroids, which can either be inhaled or administered in the form of a pill.). In other words, Dr. Walker prescribed appropriate medication for

55

the symptoms that Marcum reported.

Dr. Walker correctly objects that the R&R turns "deliberate indifference" into a "mere negligence" standard. He points out that:

> "the provision of prescriptions at the request of an inmate, which he alleges to have been previously prescribed, and which provides relief such that no further request for care is made, cannot constitute deliberate indifference. Dr. King merely addresses these omissions as deviations from the standard of care. They are at best allegations of "mere negligence."

(doc. no 132 at 6). Dr. Walker points out that the Magistrate Judge accepted plaintiff's articulation of the "standard of care" (see doc. no. 125 at 26-27) and completely ignored various sources of medical testimony indicating that in the correctional setting, the provision of an inmate's reasonable request for a "home medication refill" was appropriate under the circumstances. Dr. Todd Randall Wilcox, M.D., testified that "certainly many patients come in who have been on treatment in the past, and they're seeking continuation of that treatment. That's certainly reasonable. . . And particularly with medications like Albuterol that are used on an as-needed basis, many times we write prescriptions for Albuterol for patients to keep even though they don't actively have symptoms at the time because they had a history or there may be intermittent symptoms so they have the medication available to them when they're symptomatic" (Wilcox Dep. at 25-27). In other words, plaintiff disputes the adequacy of the care provided to Marcum. This does not amount to a triable constitutional issue.

Plaintiff's own medical witness acknowledges that mild asthma attacks are

usually successfully treated with Albuterol (King Dep. at 27-28, Q: Are most mild asthma attacks usually successfully treated with Albuterol or similar prescribed medications? A: Yes, they are. Generally patients with intermittent asthma can be satisfactorily treated with short-acting bronchodilators). In sum, the record demonstrates that Dr. Walker was attentive, rather than indifferent, to Marcum's request for medical care.

While it is possible in some circumstances for medical treatment to be so inadequate as to amount to no treatment at all, see Dominguez v. Corr'l Med. Servs., 555 F.3d 543, 551 (6th Cir. 2009), the medical treatment here cannot fairly be characterized in this way. The medical testimony reflects that patients with asthma generally can be satisfactorily treated with short-acting bronchodilators, such the Albuterol tablets and inhaler provided to Marcum by Dr. Walker (Looman Dep. at 90; King Dep. at 27-28; Wilcox Dep. at 25-28; Exline Dep. at 22 "Albuterol ... is medication we use very frequently for asthma").

Although plaintiff faults Dr. Walker for allegedly not "following up" with Marcum, it is undisputed that Marcum made no further written requests for medical care. The record also reflects that he refused the offer of a physical examination on November 10, 2008. Consistent with the "standard of care" urged by plaintiff, vitals were routinely taken during such examinations (Walker Dep. at 22, Q: Did you routinely take vitals of the patients you saw at doctor's sick call? A: As I recall, yes ... usually the nurse would do that."). Although plaintiff points out that he was offered this examination beyond 15 days from booking, which is later

57

than Ohio's administrative requirement, violation of a state regulation "by itself ... cannot supply the foundation for a federal constitutional violation." Smith v. City of Salem, 378 F.3d 566, 578 (6th Cir. 2004); see also, e.g. Horner v. Klein, 497 Fed. Appx. 484, 489 (6th Cir. 2012).

Dr. Walker's prescription to Marcum (for a week's worth of Albuterol tablets) was refilled. Marcum waited several days beyond a week for the first refill and then did not take the refill tablets as often as the doctor recommended. Marcum made no further written requests for medical care. The evidence does not reflect that Dr. Walker knew of (or should have known of) any need for additional treatment under the circumstances. See Burgess, 735 F.3d at 477 (affirming summary judgment for defendant where plaintiff failed to establish the subjective prong because there was no evidence that defendant knew, or should have known, of any need for further treatment).

Plaintiff's argument attempts to places the doctor in a "Catch-22" situation - Marcum declined the offered examination, and Dr. Walker could not "force" Marcum to have a physical examination, but Marcum then faults Dr. Walker for not examining him to take his "vitals" and for continuing to provide asthma medication that is considered "typical frontline treatment" for asthma and which Marcum himself indicated he had previously taken. Had Dr. Walker refused to prescribe or refill this "typical frontline treatment" for a newly-admitted inmate with a self-reported history of asthma, plaintiff would no doubt be arguing that such refusal amounted to "deliberate indifference." Plaintiff cannot have it both

ways.

Dr. Walker points out that it is undisputed that he was not advised of any worsening symptoms after Marcum was given his prescription medication and inhaler (doc. no. 132 at 3). Other than his refill request, Marcum subsequently made no further written requests for medical care. Dr. Walker could reasonably infer that the treatment had adequately resolved Marcum's complaints. Plaintiff seeks to place the responsibility for "follow-up" on Dr. Walker, when in fact, plaintiff had the personal responsibility to advise of any ongoing physical complaints and could have had a physical examination (King Dep. at 52-53: A: When someone is in jail they do have some responsibility to let someone know that they are having a problem"). Although plaintiff now complains in hindsight that Dr. Walker "should have done more," the subjective component of a constitutional "deliberate indifference" claim is intended "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." Rouster v. Cty. of Saginaw, 749 F.3d 437, 447 (6th Cir. 2014) (citing Estelle, 429 U.S. at 106).

As for the events of November 16-17, 2008, Dr. Walker points out in his objections that it is undisputed that he was not advised of Marcum's acute symptoms that evening (doc. no. 132 at 3; see Walker Dep. at 74 "I heard about it from the nurse the next week"). "Generally, courts find deliberate indifference where there is evidence tending to establish that the physician is present while the

inmate is in distress, that distress is communicated to the physician, and the physician purposefully ignores the distress knowing that an adverse outcome is likely to occur." Id. (citing Jones, 625 F.3d at 945). Such is not the case here. The evidence does not indicate that Dr. Walker was aware of and ignored any worsening symptoms. Rouster, 749 F.3d at 450 (observing that medical assistant "did not provide constitutionally deficient treatment by failing to address pain of which she was not aware").

To the extent plaintiff attempts to "impute" knowledge to Dr. Walker regarding the events of November 16-17, 2008, it is undisputed that Dr. Walker was not advised of those events until after the fact. It is well-settled that each defendant's subjective knowledge must be assessed separately, and the information available to one defendant may not automatically be imputed to other defendants. Rouster, 749 F.3d at 447; Gray, 399 F.3d at 616; see, e.g., Runkle v. Kemen, 529 Fed.Appx. 418, 426 (6th Cir. 2013) (affirming the district court's conclusion that there was "no basis for imputing any improprieties on the part of other members of the [other individuals] to Dr. Kemen during this time period").

The Supreme Court has emphasized that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of* and *disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. While plaintiff criticizes the

60

"level of care" provided for Marcum's asthma (doc. no. 134 at 2), the Supreme Court has explained that an "official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to a violation of the 8th Amendment. Id. at 838; see, e.g., Runkle, 529 Fed.Appx. at 425 (where physician did not examine inmate upon admission to jail and nurse determined the best course of action was to continue inmate's current medication, summary judgment was granted in favor of prison physician on § 1983 claim).

Although Marcum was treated with appropriate medication for routine symptoms of asthma, an "unknown trigger" caused his death from "status asthmaticus" due to an "acute allergic reaction." Based on the undisputed evidence of Valium metabolite in Marcum's body from within 24 hours of use, defendants point out that Marcum's abuse of this drug likely triggered the acute allergic reaction and cardiac arrest that killed him. While the precise "trigger" is not known, the relevant point here is that Dr. Walker had provided "typical frontline treatment" for intermittent asthma and had no reason to believe Marcum was at serious risk of having such acute allergic reaction. The medical attention given to plaintiff for his asthma was constitutionally adequate. Although plaintiff criticizes "the level of treatment that Dr. Walker provided to Mr. Marcum for his asthma" (doc. no. 134 at 2), this amounts to the sort of "they should have done more" argument that courts have repeatedly rejected as a basis for deliberate indifference to serious medical needs. See Rouster, 749 F.3d at 445 (granting summary judgment on deliberate indifference claim where plaintiff relied on

medical experts who merely opined that the medical treatment fell short of the "optimal standard of care"). In sum, Dr. Walker's objections have merit and he is entitled to summary judgment on the "deliberate indifference" claim under § 1983.

**VII. the Individual Officers' "Motion for Summary Judgment" (doc. no. 78)**

Plaintiff has sued six individual officers: Jason Lute, Craig Johnson, Jay Springs, Brett Ervin, Zach Conkel, and Kristi Powell. The evidence reflects that the 3rd shift officers rendered immediate emergency care when Marcum exhibited severe breathing difficulties after midnight (King Dep. at 59, Q: Do you have any criticisms of the actual emergency care rendered to Mr. Marcum from the time he collapsed until the time he left with the ambulance? A: No.). Plaintiff agrees that all claims against the 3rd shift officers should be dismissed (doc. no. 107 at 5, 49, indicating she is "voluntarily dismissing the claims against three individual defendants: Kristi Powell, Brett Ervin, and Zach Conkel). The Court agrees that dismissal of the 3rd shift officers is appropriate, and will focus the analysis on the 2nd shift officers.

Officers Lute, Johnson, and Springs move for summary judgment on the individual capacity claims against them (doc. no. 78). They assert that they are each entitled to qualified immunity and that the evidence does not indicate that they were "deliberately indifferent" to Marcum's serious medical needs. They also assert that they are statutorily immune from plaintiff's state law wrongful death claim because the evidence does not show that they acted maliciously, in bad faith, wantonly, or recklessly. They point out that although plaintiff generally

alleges that unspecified guards allegedly ignored alleged Marcum's oral complaints on November 16, 2008, plaintiff has not pointed to specific facts identifying "who, what, when and where." They contend there is no evidence that Marcum "ever complained directly to these defendants of a serious medical need, let alone that these defendants knew objectively or subjectively that he was in need of immediate attention but did nothing about it" (doc. no. 78 at 3). They point out that plaintiff's witness, Dr. King, testified that with respect to the care and treatment of Marcum, he had "no criticisms of any of the individual defendants" (King Dep. at 11-13).

The defendants point out that the analysis must be "individualized." "[I]t is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." Reilly, 680 F.3d at 624; Stoudemire v. Mich. Dept. of Corrs., 705 F.3d 560, 570 (6th Cir. 2013). "Each defendant's liability must be assessed individually based on his own actions." Binay, 601 F.3d at 650. Each defendant's subjective knowledge should be assessed separately and the information available to one defendant may not automatically be imputed to other defendants. Rouster, 749 F.3d at 447; Gray, 399 F.3d at 616; Krutko, 559 Fed.Appx. at 509 (remanding § 1983 action against jail deputies because the court was required to make an "individualized assessment of the actions of each deputy upon assertion of qualified immunity"). The defendants point to the following evidence:

Officer Lute worked in the dorm area from approximately 4:00 p.m. until approximately 6:40 p.m. (doc. no. 78, Lute Aff. ¶ 5). He performed several security checks through the entire dorm (¶ 6). He indicates that Marcum never complained to him about any problems, medical or otherwise, that evening (or at any other time) (¶ 7).

Officer Johnson (who himself has asthma) worked in the dorm area from "approximately 6:40 p.m. until approximately 9:20 p.m. (doc. no. 78, Johnson Aff. ¶ 5). He performed at least two security checks through the entire dorm (¶ 6). He also passed medication to the inmates at approximately 8:22 p.m. (¶ 7). He indicates that Marcum walked up and inquired about his inhaler during that shift, but did not want an inhaler of that color and walked away. Officer Johnson indicates that Marcum never complained to him about any medical problems (¶ 8).

Officer Springs indicates he worked in the dorm area from approximately 9:20 p.m. until midnight (doc. no. 78, Springs Aff. ¶ 5). He indicates that "while working in the dorm, I performed at least three security checks (9:40 p.m., 10:15 p.m., and 11:07 p.m.) in which I would have walked through the entire dorm (¶ 6). He indicates that Marcum never complained to him about any problems, medical or otherwise, that evening (or at any other time) (¶ 7). He indicates that he was not advised by any officers previously on duty that Marcum was having any problems (doc. no. 31-3 at 4-5, BCI Interview). Justin White testified that he did not recall any interaction between Marcum and Officer Springs (White Dep. at 90).

In response, plaintiff contends that "Officers Lute, Johnson, and Springs

were on duty and conducting jail checks in the area of the jail in which Mr. Marcum was housed in the hours leading up to Mr. Marcum's death" (doc. no. 107 at 40-41). Plaintiff also relies on the following evidence: 1) Candy Marcum testimony that when she spoke to her husband by phone around noon on November 16, 2008, she heard him wheezing and he said he was having a hard time breathing (Candy Marcum Dep. at 65, 105); 2) Inmate White's testimony that Marcum "had a pretty hard time trying to breathe. He tried to catch his breath, he couldn't catch his breath. It just seems as time went on, it progressed worse. . . . He had problems earlier that day, too, but it just got really bad in the evening" (White Dep. at 22); 3) Inmate Adams's BCI interview (indicating that on November 16, Marcum was pale and white, that his breathing got progressively worse that evening, that Marcum approached an officer around 5:30 on November 16 requesting a breathing treatment but did not receive one, and that an hour later he requested an inhaler from the same officer); 4) Dr. Exline's testimony that he believed Marcum's symptoms were "developing" 6-12 hours before he died of status asthmaticus; and 5) Dr. Wilcox's testimony that Marcum's asthma was "progressing" several days before he died.

the Magistrate Judge's Recommendations as to Officers Lute, Johnson, and Springs

The Magistrate Judge recommended that "genuine issues of material fact preclude summary judgment for the Individual Officers" (doc. no. 125 at 29). She reasoned that the officers "were all on duty at Scioto County Jail on November 16,

65

2008 during the relevant time period that Marcum exhibited symptoms of a severe asthma attack" (doc. no. 125 at 30). She indicated that the evidence reflected genuine disputes of material fact, including:

> 9. ... whether Marcum requested further medical attention and whether Marcum was denied requested medical care.
>
> 10. ... whether Marcum requested and was denied medical assistance from [defendants Jay Springs, Jason Lute, and/or Craig Johnson] during their November 16, 2008 shift ... [and] whether these defendants were aware that Marcum was having difficulty breathing on November 16, 2008.

(doc. no. 125 at 18, citing doc. no. 93, Proposed Findings).

> <u>the Defendants' Objections</u>

The defendant object that:

> The Magistrate Judge's reasoning turns the subjective element of deliberate indifference into a nullity. Defendants Lute, Johnson and White cannot be liable under § 1983 simply because they happened to be on duty while Mr. Marcum was experiencing an asthma exacerbation.

(doc. no. 133 at 68). They point out that merely being "on duty" is not the relevant factor, rather, the issue is whether each officer was aware of and deliberately ignored any serious medical need during that time. The officers must not only have been aware of facts from which they could infer that Marcum had a serious medical need, they must also actually have drawn that inference. <u>Farmer</u>, 511 U.S. at 837-38. An officer is not liable for failing to attend to an inmate's serious medical need that he should have, but did not, perceive. <u>Id</u>.; <u>Harbin v. City of Detroit</u>, 147 Fed. Appx. 566, 571 (6th Cir. 2005) (same).

66

Defendants object that "the only evidence against Officer Lute is the hearsay statement of Tommy Adams, who describes speaking to an officer not resembling Lute" (doc. no. 133 at 69). Although the R&R states that the parties dispute "whether inmate White recalled any interaction between Marcum and ... Lute prior to midnight on November 16, 2008" (doc. no. 125. at 19), the defendants object that there is *no such dispute* (doc. no. 133 at 32). The record reflects that Justin White testified that he did not recall any interaction between Marcum and Officer Lute (White Dep. at 90).

With respect to Officer Johnson, the defendants object that the Magistrate Judge erred:

> in concluding that Officer Johnson's affidavit contradicts his deposition. In his deposition, Officer Johnson testified that Mr. Marcum asked for and, ultimately, refused an inhaler. He was not complaining of being ill and did not show any signs of having an asthma attack. Johnson's affidavit stating that Mr. Marcum never complained of a medical problem is not contradictory. Marcum's request and refusal of an inhaler is not a medical problem.

(doc. no. 133 at 69, fn. 24). While the Court agrees that Officer Johnson's affidavit does not contradict his deposition, the evidence begs the question "why" Marcum requested the inhaler. He may have been checking for the routine refill or he may have been requesting it at that time in light of worsening symptoms. Although the defendants argue that Officer Johnson never perceived that Marcum was having breathing difficulties (doc. no. 133 at 70, citing Johnson Dep. at 12), Inmate White testified that he told Officer Johnson that Marcum needed to go to the hospital (White Dep. at 82). On summary judgment, the Court must construe evidence and

reasonable inferences in plaintiff's favor. If Marcum's condition had already deteriorated to the point that a fellow inmate was informing Officer Johnson that Marcum needed to go to the hospital, it is reasonable to infer that Marcum's condition continued to worsen while Officer Springs subsequently observed the inmates in the dorm area, including Marcum.

Review of the record reflects conflicting evidence regarding Marcum's condition over the course of second shift. Some evidence suggests that Marcum was having trouble breathing as early as noon on November 16, 2008. His condition continued to worsen, culminating in status asthmaticus and cardiac arrest. Plaintiff argues that because all three officers personally patrolled the 60-inmate dorm area during this 2nd shift, they "must have known" of Marcum's worsening condition and breathing difficulties. The conflicting evidence as to whether Marcum was displaying observable signs that he needed medical help precludes summary judgment  here. See, e.g., Titlow, 507 Fed.Appx. at 579 (finding genuine issue of material fact as to whether prison guard acted with deliberate indifference in failing to obtain medical attention for inmate). The Sixth Circuit Court of Appeals has explained that "where a plaintiff's claims arise from an ... illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention, ... it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." Blackmore, 390 F.3d at 899-900. In sum, the Court agrees with the Magistrate Judge that the 2nd shift officers are not entitled to

qualified immunity or to state immunity. <u>Rodriguez v. Passinault</u>, 637 F.3d 675, 689 (6th Cir. 2011) ("If the legal question of immunity is completely dependent on which view of the facts the jury accepts, the district court should not grant summary judgment on the issue.").

## VIII. the County Defendants' "Motion for Summary Judgment" (doc. no. 77)

Plaintiff has sued the County Defendants under § 1983 and state law. The County defendants correctly object that "the Magistrate Judge seemed to accept disputed issues of fact simply because plaintiff underlined them pursuant to the District Judge's standing order ... This is improper. Genuine issues of fact must be based on admissible evidence in the record" (doc. no. 133 at 31). The Court has already addressed this issue herein.

### A. the § 1983 Claim against the County Defendants

The liability of a local government, such as Scioto County, under § 1983 "depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the county." <u>Holloway v. Brush</u>, 220 F.3d 767, 772 (6th Cir. 2000) (en banc). "[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.' " <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Monell v. NY City Dept. of Soc. Servs.</u>, 436 U.S. 658, 694 (1978)). Municipal liability must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff." <u>Id</u>. at 385. "Respondeat superior or vicarious liability will not attach under § 1983." <u>Id</u>. Plaintiff has not alleged any conduct

69

attributable to Sheriff Donini and seeks to impose liability on him only because of the supervisory positions he holds.

A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury. Monell, 436 U.S. at 690–91 ("It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983"). To impose § 1983 liability upon a local governmental body, a plaintiff must show that the municipality itself is the wrongdoer. Collins v. City of Harker Hts., 503 U.S. 115, 122 (1992).

One way to prove an unlawful policy or custom is to show a policy of deliberately indifferent training or supervision. Canton, 489 U.S. at 387-390. To succeed on a failure to train or supervise claim, plaintiff must prove that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006); Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992).

Plaintiff argues that Dr. Walker, as medical director, allegedly failed to supervise or train staff sufficiently. A § 1983 suit against a defendant in his official capacity is equivalent to a suit against the local governmental entity. Leach v. Shelby Cty. Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989), cert. denied, 495 U.S. 932

(1990). The Sixth Circuit Court of Appeals had repeatedly held that "§ 1983 liability must be based on more than respondeat superior, or the right to control employees." Phillips v. Roane Cty., Tenn., 534 F.3d 531, 543 (6th Cir. 2008) (quoting Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)). A supervisor is not liable under § 1983 for a failure to train unless he "either encouraged the specific incident of misconduct or in some other way directly participated in it." Id.; and see, e.g., Rush v. City of Mansfield, 771 F.Supp.2d 827, 860 (N.D Ohio 2011) (rejecting plaintiff's suggestion that liability be imposed based on supervisory role and indicating that "plaintiffs misunderstand supervisory liability under § 1983"). "Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability." Miller v. Calhoun Cty., 408 F.3d 803, 817 n. 3 (6th Cir. 2005). At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Phillips, 534 F.3d at 543. In their objections (doc. no. 133 at 51), the defendants point out that a "plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury." Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006) (citing Monell, 436 U.S. at 690-91).

In their objections, the defendants point out that the Magistrate Judge identified the alleged underlying constitutional violation as "Dr. Walker was deliberately indifferent to Marcum's serious medical needs by failing to physically

examine Marcum or direct that Marcum's vitals be assessed in conjunction with the prescription of drugs for Marcum's asthma" (doc. no. 133 at 47, citing R&R at 28). Defendants assert that the jail had constitutional policies for medical care and that such policies were not the "moving force" behind this alleged constitutional violation. Defendants object that "the Magistrate Judge is incorrect that Scioto County failed to properly train its officers and, further, even if the Magistrate Judge were correct, Plaintiff's alleged failures to train have no causal connection to the underlying constitutional violation" (doc. no. 133 at 52). The Court agrees. Moreover, there was no underlying "deliberate indifference" by Dr. Walker.

Plaintiff faults Dr. Walker and the County defendants because inmates were supposed to have a physical examination within fifteen days of incarceration pursuant to Ohio Admin.Code § 5120:1-8-09, but according to plaintiff, were "solicited to refuse" by medical staff and/or correctional officers. Plaintiff points to 106 prisoner records (out over 5,000 prisoners booked that year) where inmates declined a physical. Plaintiff asserts in conclusory fashion that there is a "systemic problem" at the Scioto County Jail.

Defendants assert that this small sample is statistically meaningless, particularly since the forms reflect no reasons why any inmates declined (doc. no. 115 at 11, citing Wilcox Dep. at 61-63). Although plaintiff claims that jail staff solicited" such refusals, the deposition testimony does <u>not</u> reflect this. In fact, the testimony reflects the opposite, i.e. that the nurse and officers would encourage inmates to get their physicals and take their medications. Nurse Estes indicated

that if inmates refused the physical, he would look at their screening form to "see if there's any type of issues" and then go down to the living area to speak with them and encourage them to have the physical examination "because they may have some misconceptions about what it was" (Estes Dep. at 23-25). Deputy Frantz testified that he would ask inmates if they wanted the physical examination with the doctor and/or nurse, and that if they told him "No," he would explain the form to them (Frantz Dep. at 59-62 "it's up to them whether or not they want it . . . they're not made to get it. If they don't want it, they would fill out their name and sign it."). The testimony reflects that prisoners were asked if they wanted a physical and were then requested to sign a release only if they indicated they wanted to decline. Contrary to plaintiff's characterization, the testimony does not indicate that inmates were encouraged to refuse, nor does it indicate that Dr. Walker encouraged any staff to "solicit" refusals (Walker Dep. at 49 indicating that if an inmate refused medical care, including the physical, the officers "would ask them, are you sure that you want to do that. There is a risk ..."). Similarly, Inmate David Merrill testified that if an inmate did not show up to the medical area to get his medicine, the guards would go back to the living area and try to convince the inmate to take the medicine (Merrill Dep. at 35-36 "It's the one's that have to take medication, inhalers or something that they make -- they make sure they got their stuff. Q: And that's a good thing, right? A: Yes.).

    In any event, the inmates were adults who were within their rights to decline a physical or other medical treatment if they chose to do so (Walker Dep. at 36

indicating the prisoners "were adults, if they refused, they refused"). Even plaintiff's medical witness recognized this (King Dep. at 69: Q: Are you claiming that the jail staff should have required Mr. Marcum to have a health screen even if he didn't feel he wanted one? A: No.).

Defendants point out that an inmate who is not experiencing any symptoms would be likely to decline a physical (doc. no. 115 at 11). A prisoner who has already received treatment that alleviates symptoms may also chose to decline a physical. Regardless, it is undisputed that inmates at the Scioto County Jail had access to medical staff, including nurses and a doctor. The reasonable inference to be drawn here is that an inmate not suffering from any significant health symptoms would likely decline an offered physical examination, but could (and probably would) request medical care if he had any serious health concerns at that time.[28]

To the extent the plaintiff has argued that there were some blank spaces in

---

[28] The testimony suggests various reasons why inmates might refuse an examination. Estes explained that "it's an inconvenience to have to ... walk to the medical area, sit in a holding cell and wait for a nurse to ask you a bunch of questions. Most inmates didn't like to have to come down there" (Estes Dep. at 22). Deputy Frantz testified that some inmates declined because they were being released soon (Frantz Dep. at 63). Dr. Wilcox indicated that in his experience, inmates may "refuse the physical because they know they're not going to be there long enough for it to matter to them" (Wilcox Dep. at 63). Although inmates were charged a modest fee of a few dollars for some medical services, the fee was often waived and inmates were given medical care even if they lacked funds to pay (Donini Dep. at 56-59). Dep. Sparks testified that he didn't think that inmates were charged for the physical (Sparks Dep. at 43-44, 48). Regardless, Marcum had funds available in his jail account (Candy Marcum Dep. at 68). The record does not indicate Marcum's reason for declining the physical, but does reflect that Marcum had already had a physical that year in connection with his 2008 job (Id. at 42-43).

the medication logs and that this reflects some sort of "systemic" problem, the defendants correctly point out (doc. no. 133 at 52) that "the policy of the Sheriff's Department is to record all administration or refusal of medication" and that the Supreme Court has held that there is no municipal liability where "an otherwise sound program has occasionally been negligently administered." <u>City of Canton</u>, 489 U.S. at 391.

To the extent that the plaintiff is attempting to argue that any supervisory officials should held liable in their individual capacities for alleged "failure to train" employees regarding proper protocols, the Sixth Circuit Court of Appeals has explained that "this improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." <u>Phillips</u> , 534 F.3d at 543; see also, <u>Everson v. Leis</u>, 556 F.3d 484, 495 (6th Cir. 2009) (holding that plaintiff was improperly conflating a § 1983 claim of individual supervisory liability with a claim of municipal liability); <u>Broyles v. Corr'l Med. Servs., Inc.</u>, 478 Fed.Appx. 971, 977 (6th Cir. 2012) (observing that although plaintiff alleged that the medical services director "failed to properly supervise, develop, and provide an adequate medical system and staff to respond to medical emergencies," such allegation "improperly conflates a § 1983 claim of individual supervisor liability with one of municipal liability"). As in <u>Phillips</u>, plaintiff's argument is more appropriately applied to the failure-to-train theory against the municipality, rather than the medical director in his individual capacity. <u>Phillips</u>, 534 F.3d at 544.

Defendants point out that "it is only Dr. Walker's conduct that is at issue

because Plaintiff does not allege any <u>Monell</u> violations relating to the conduct of the individual Scioto County Defendants (Lute, Johnson, Springs) who worked in the jail dorm on November 16, 2008 or any other Scioto County employee" (doc. no. 115 at 2, fn. 1). Given that Dr. Walker is entitled to summary judgment on the deliberate indifference claim, the County defendants are also entitled to summary judgment on the § 1983 claim. See, e.g., <u>Harbin</u>, 147 Fed. Appx. at 572 (explaining the well-settled rule that a municipality cannot be held liable under § 1983 unless a constitutional violation by its agents is first established).

### B. the State Claims

The County Defendants assert that the plaintiff's state law claims against them fail because they are entitled to statutory immunity under Ohio R.C. § 2744(A) ("a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function").

In response, plaintiff concedes that she "agrees that Scioto County is immune from liability under O.R.C. § 2744.02 (A) on the plaintiff's state law claims" (doc. no. 107 at 50). Plaintiff also concedes that summary judgment is appropriate on the state law wrongful death claim against Scioto County (doc. no. 107 at 46).

Defendants object to the Magistrate Judge's recommendation that state law immunity be denied to Sheriff Donini on the wrongful death claim (doc. no. 133 at 63). The R&R indicated that a jury could find that Sheriff Donini "acted recklessly

by failing to ensure that the medical system provided an adequate level of care to its inmates" (doc. no. 125 at 52).

Ohio R.C. § 2744.03(A)(6) provides that an employee is personally immune from liability unless "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code." Ohio law defines "recklessness" under this statute as the "perverse disregard of a known risk." O'Toole v. Denihan, 118 Ohio St.3d 374 (2008). The County defendants correctly point out that the record does not reflect evidence suggesting any such perverse disregard of a known risk. The defendants point out that the state appellate case (Moss v. Lorain Cty. Bd. of Mental Retardtn., 924 N.E.2d 401 (Ohio Ct. App. 2009) relied on by the Magistrate Judge was a school case decided on Rule 12(b)(6) and bears little relation to this case. Ohio law defines "wanton conduct" as "the failure to exercise any care whatsoever." Range v. Douglas, 878 F.Supp.2d 869, 892 (S.D.Ohio 2012) (J. Barrett) (citing Fabrey, 639 N.E.2d at 35) ("mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor"). The record does not reflect this.

IX. Conclusion

Dr. Walker is entitled to summary judgment on the § 1983 claim because the evidence does not reflect any genuine disputes of material fact as to whether he

was deliberately indifferent to Marcum's serious medical needs. Dr. Walker's motion does not address the remaining three state law claims against him.

The 3rd shift officers (Powell, Ervin, and Conkel) responded appropriately to Marcum's serious medical need on November 17, 2008, and plaintiff acknowledges that all claims against them should be dismissed. As for the 2nd shift officers (Lute, Springs, and Johnson), there is conflicting evidence, which when construed in plaintiff's favor for purposes of summary judgment, suggests that Marcum was having difficulty breathing during 2nd shift on November 16th, such that genuine disputes of material fact preclude summary judgment on the § 1983 claim and the state claim of wrongful death.

The County Defendants are entitled to summary judgment on the § 1983 and state claims.

Accordingly, the Court rules as follows:

1) the Report and Recommendation (doc. no. 125) is **MODIFIED** as set forth herein;

2) the Objections by Dr. Walker (doc. no. 132) are **SUSTAINED**; his "Motion for Summary Judgment" (doc. no. 82) is **GRANTED**;

3) the joint Objections by the Officers and County Defendants (doc. no. 133) are **SUSTAINED in part and OVERRULED in part** as set forth herein;

4) the Individual Officers' "Motion for Summary Judgment" (doc. no. 78) is **DENIED** as to Officers Lute, Springs, and Johnson, but **GRANTED** as to Officers Powell, Ervin, and Conkel, who are dismissed from this action; and

**5)** the County Defendants' "Motion for Summary Judgment" (doc. no. 77) is

<u>GRANTED</u>. This case shall proceed as scheduled.

IT IS SO ORDERED.

s/Herman J. Weber<br>
Herman J. Weber, Senior Judge<br>
United States District Court